[Civil No. 3143.   Filed May 31, 1932.]

[11 Pac. (2d) 833.]

# THE EQUITABLE LIFE ASSURANCE SOCIETY OF THE UNITED STATES, a Corporation, Appellant, v. NELLYE A. PETTID, Appellee.

Messrs. Armstrong, Kramer, Morrison & Roche, for Appellant.

Messrs. Hayes, Stanford, Walton, Allee & Williams, for Appellee.

LOCKWOOD, J.—This is an action by Nellye A. Pettid, hereinafter called plaintiff, against the Equitable Life Assurance Society of the United States, a corporation, hereinafter called the defendant, to recover on a certain life income insurance policy issued by defendant, as insurer, upon the life of Michael John Pettid, hereinafter called the insured, and in favor of plaintiff as beneficiary.

The policy is dated August 7, 1920, and originally provided for the payment of a premium of $910.10 on July 21st of each year, which included a premium of $24 for double indemnity, as hereinafter discussed, and also of $35.50 for total and permanent disability features, with which last we are not concerned.

At the request of the insured, the mode of payment was changed to quarterly installments of $241.20 each, payable on July 21st, October 21st, January 21st and April 21st of each year. The policy provided that, upon the death of the insured, there should be paid to the plaintiff by the defendant a monthly income of $100 for twenty years, and as long thereafter as the beneficiary should live, but, if she died before the payments had been made for the twenty years, the income should not terminate, but be paid to the beneficiary's executors and administrators until the completion of the twenty-year period.

It also contained certain special features as the result of which this litigation arose. We quote these provisions from the policy as follows:

"Upon due proof that the death of the insured occurred in consequence of bodily injury effected solely through external, violent and accidental means,

. . . the Society will pay instead of the face amount of this policy, double that amount, making a monthly income of two hundred dollars, provided all premiums have been duly paid and this policy is then in full force and effect. . . . ''

''The proportion of divisible surplus accruing upon this policy shall be ascertained annually. Beginning at the end of the second insurance year, and on each anniversary thereafter such surplus as shall have been apportioned by the Society to this policy shall at the option of the Insured (or assignee if any), be either—1. Paid in cash; or 2. Applied toward the payment of premiums; or, 3. Applied to the purchase of paid-up Additional Insurance (without double indemnity or total and permanent disability benefits): or, 4. Left to accumulate at 3% interest, compounded annually. If a higher average annual rate is earned, this may be increased by an interest dividend as determined and apportioned by the Society. Such accumulations will be payable upon the maturity of this policy or on any anniversary of its register date.

''Unless the insured (or the assignee if any) shall elect one of the foregoing options within three months after the mailing by the Society of a written notice requiring such election, the dividend shall be applied to the purchase of paid-up Additional Insurance (Option 3.) . . . .

''This policy is based upon the payment of the premiums annually; but premiums may be paid subject to the Society's written approval, in semi-annual or quarterly installments at the Society's adopted rates for fractional premiums. . . . A grace of thirty-one days, subject to an interest charge at the rate of 5% per annum, will be granted for the payment of every premium after the first, during which period the insurance hereunder shall continue in force. . . . Except as herein expressly provided, the payment of any premium or installment thereof shall not maintain this policy in force beyond the date when the succeeding premium or installment thereof becomes payable. . . . If this policy shall lapse in consequence of the non-payment of any premium when due, it may be rein-

stated at any time upon the production of evidence of insurability satisfactory to the Society, and the payment of all overdue premiums, with interest at 5% per annum. . . .

"After three full years' premiums have been paid hereon, upon any subsequent default in the payment of any premium or installment thereof, and within three months after such default, this policy may be surrendered by the Insured (or assignee if any) who may elect one of the following options:

"(a) To receive the Cash Surrender Value of this policy; or

"(b) To purchase non-participating paid-up life insurance payable in a single sum upon receipt of due proof of death of the insured, but without double indemnity or total and permanent disability benefits; or

"(c) To continue the insurance for the Income as originally provided (and any outstanding dividend additions) as paid-up extended term insurance for the period shown in the above table, or for such further period as the dividend additions (if any) will purchase, but without future participation, or right to loans, or double indemnity or total or permanent disability benefits. The Income payable if this policy is thus extended is limited to twenty years, plus any additional Income provided by additional Reserve as explained below.

"In the event of default in the payment of any premium or installment thereof after this policy has been in force three full years, if the Insured (or assignee if any) does not select one of said options within three months of such default, the insurance shall be continued as provided under Option (c) . . .

"Agents are not authorized to modify, or in event of lapse to reinstate this policy, or to extend the time for payment of any premium or installment thereof."

The insured failed to pay when due, or within the grace period thereafter, the premium installments due on January 21st and April 21st, 1922, and the policy lapsed. It was afterwards reinstated upon the insured paying the two delinquent installments and undergoing a medical examination which was reported

on the usual form used by defendant for that purpose, which form, not only includes details as to the personal health of the insured, but a number of other matters bearing upon his insurability. After such requirements were met by the insured, the policy was reinstated as of June 2nd, 1922. He also failed to pay the April 21st, 1925, installment, and was required, as a condition preliminary to reinstatement, to make an application certifying himself to be in good health. He also failed to pay the January 21st, 1926, installment, and was required again to furnish the medical examination certificate above referred to. All premiums due on the policy up to July 21st, 1930, were paid either on time or else were accepted by the company on reinstatement, as above set forth, and on June 14th, 1930, the usual notice of installment due July 21st of that year was mailed to defendant, together with a notice of an accrued dividend of $229.77. This premium was not paid on or before its due date, so the cashier of defendant's local office at Phoenix, Arizona, mailed to the insured between August 12th and 14th a notice that August 21st was the last day of grace for payment. The insured disregarded all of these notices, and the premium was not paid within the period of grace provided by the terms of the policy, as above, and therefore by those terms automatically lapsed.

On August 29th the local cashier mailed to the insured the following letter:

"Dear Mr. Pettid:

"Re: Policy No. 2646 607

"According to our records the quarterly premium due July 21 under your above policy has not been paid, and your contract has been permitted to lapse. Your previous remittances have always been very prompt, and we feel sure that you will wish to apply for reinstatement at an early date.

"We shall be glad to consider restoring the policy to a premium paying basis if you will complete the enclosed statement of health and return it with your remittance of $241.20 to cover the premium. Your current dividend lacks only $11.43 of being sufficient to cover this entire premium, and if you wish to use it in this manner, please sign the enclosed forms and return them with a check for $11.43.

"In case it is not convenient for you to make any cash outlay, please get in touch with us promptly, as we are sure that some arrangement can be worked out for assisting you. May we hear from you at your first convenience concerning this matter?

"Yours very truly,
"J. L. BEESLEY, Cashier
"By: J. L. BEESLEY."

—and inclosed with the letter was a form of request for reinstatement which included a warranty of good health by the insured, and another copy of the dividend notice of $229.77.

On September 9th, 1930, the cashier received through the mails a check signed by the insured for $11.43 and the unsigned dividend notice above referred to. These were attached to the letter of August 29th which had been forwarded to the insured, but no statement of health or formal application for insurance accompanied them, nor was one ever received by defendant. On receipt of the check and the unsigned dividend notice, the cashier on the same day wrote and mailed to plaintiff the following letter:

"Dear Mr. Pettid.
"Re: Policy No. 2646 607

"Our attached temporary receipt will acknowledge your remittance of $11.43 tendered to supplement your dividend for the quarterly deposit which is slightly overdue under your above life income contract.

"As the grace period for the premiums has expired, you should complete and return the attached personal

statement of continued good health in order that restoration could be considered. For your convenience in returning the necessary form to us, we attach our self-addressed stamped envelope and shall very much appreciate your prompt attention in the matter.

"Yours very truly,
"J. L. BEESLEY, Cashier
"By J. L. BEESLEY."

—and inclosed therewith a receipt in the following language:

"Equitable Life Assurance Society of the United States, 393 Seventh Avenue, New York City

"Receipt No. 404777.

"Agency at Phoenix, Az., Sept. 1930.

"Received from Michael J. Pettid Eleven 43/100 dollars ($11.43) offered for proposed restoration Pol. #2646607.

"Said sum is received only for transmission to the Home Office of the Society in New York for the account of the depositor, and the Society is in no way committed thereby to the acceptance thereof for the purpose offered nor to any action in the premises, and nothing herein or connected with the receipt of said sum shall be held to waive any default in payment of any premium, interest or other sum due, or to extend the time for payment of any premium, interest or other sum, or in any manner to affect the rights of the Society under any policy or contract of insurance or otherwise. If the said amount be not accepted by the Society for the purpose offered it will be returned to the depositor upon demand.

"J. L. BEESLEY, Cashier."

This letter was found opened upon the desk of the insured, after his death, by his daughter, but there is no evidence as to by whom it had been opened or whether or not the insured had ever read it.

After sending this letter of September 9th, the check for $11.43 was duly deposited by the defendant in its account, and shortly after the death of the in-

sured the amount was tendered to his executrix, who refused to accept it.

On September 13th the insured was seriously injured in an automobile accident as a result of which injury he died on September 15th. There is no dispute that his death was the result of accidental means, as set forth in the provision of the policy in regard to double indemnity, so that if, at the time of such death, the policy was in force, as originally written, the plaintiff would be entitled to receive the double indemnity income set forth in such provision.

Proof of death of the insured was submitted, and the defendant denied that the policy was in force and effect, except as to the paid-up extended term insurance without double indemnity, under option (c), as quoted above. After considerable discussion plaintiff accepted an income of $103.32 per month, which was thereafter duly paid her, but it was stipulated that this was done without any waiver of her claim for double indemnity benefits.

Plaintiff then instituted this action to enforce payment and settlement under the policy as though it had never lapsed. Defendant answered, setting up the lapse of the policy for nonpayment of the premium. A jury was impaneled to try the case, and at the close of the evidence defendant moved for a directed verdict. Plaintiff, on the other hand moved to withdraw the case from the jury's consideration, and for the court to render judgment for the plaintiff on the ground that there were no controverted issues of fact. This was done, and, after the usual motion for new trial was overruled, this appeal was perfected.

There are some ten assignments of error, five of which go to the evidence, and two to the conduct of the court in withdrawing the case from the consideration of the jury. We think we need not consider these assignments, as the case, in our opinion, can and should be disposed of by a determination as to whether

from the undisputed facts, as a matter of law, at the time of the death of the insured, the policy had lapsed and had never been reinstated, but had been automatically converted into paid-up term insurance in accordance with the provisions of option (c) above set forth.

There are certain general principles which we must keep in mind in determining this question, as well as the more special ones to which we shall refer hereafter. These general provisions are: (1) An insurance policy is a contract, and in an action based thereon the terms of the policy must govern. The court cannot write a new contract for the parties in accordance with its idea of what the original one should have been. *Standard Life & Accident Ins. Co.* v. *Ward,* 65 Ark. 295, 45 S. W. 1065; *Brown* v. *Conn. Fire Ins. Co.,* 52 Okl. 392, 153 Pac. 173. (2) In construing an insurance contract, where there is any ambiguity, or more than one possible construction of the provisions thereof, it is to be construed most strongly against the insurer and in favor of the insured. *United States Fidelity etc. Co.* v. *California-Arizona Co.,* 21 Ariz. 172, 186 Pac. 502; 32 C. J. 1152. (c) But, where the provisions of the contract are plain and unambiguous upon their face, they must be applied as written, and the court will not pervert or do violence to the language used, or expand it beyond its plain and ordinary meaning or add something to the contract which the parties have not put there. *Treloar* v. *Keil & Hammon,* 36 Cal. App. 159, 171 Pac. 823; *Green* v. *National Casualty Co.,* 87 Wash. 237, 151 Pac. 509. And the rule that the policy is construed most strongly against the insurer applies only to the language of the contract and not to the facts of the case. *Hardenbergh* v. *Employer's Liability Assur. Corp.,* 80 Misc. Rep. 522, 141 N. Y. Supp. 502.

With these fundamental rules to guide us, let us consider the terms of the contract. On July 21st, 1930,

a premium in the sum of $241.20 was due. Unless this premium was paid on or before August 21st the policy by its explicit terms automatically lapsed. There is and can be no contention that it was paid within that time, and it therefore follows that on the twenty-second day of August the policy was no longer in full force and effect according to its original terms. What, then, were the legal relations of the parties? From the terms of the policy above set forth, unless it was reinstated, the insured had three options. He could either receive the cash surrender value of the policy amounting at that time to some $6,600; he could purchase nonparticipating paid-up life insurance payable in a single sum without double indemnity; or he could continue the insurance as paid-up extended term insurance for some nine years, but again without any double indemnity. If the insured did not choose between these three options within three months of the default, option (c) for extended term insurance automatically took effect. No choice was ever made by the insured between these options.

We consider, then, whether the policy, under the admitted facts, was as a matter of law reinstated. This depends upon what was required to so reinstate it. The policy itself explicitly states those requirements as (a) the production of evidence of insurability satisfactory to the society; and (b) the payment of all overdue premiums with interest at five per cent. per annum. Unless and until these two things were done, there could be no reinstatement. The uncontradicted evidence is that defendant had on hand at all times the sum of $229.70 belonging to the insured which the latter could apply upon his premium if he so desired, and, indeed, it was the duty of the insurer, if such sum would have paid a premium installment due, to make such application rather than to allow the policy to lapse. *Union Cent. L. Ins. Co.* v. *Caldwell,* 68 Ark. 505, 58 S. W. 355; *McNaughton* v.

*Des Moines Life Ins. Co.,* 140 Wis. 214, 122 N. W. 764; *Fogg* v. *Morris Plan Ins. Soc.,* 115 Misc. Rep. 491, 188 N. Y. Supp. 867.

On the other hand, an insurer is not required or even permitted under the law to accept a partial payment.of a premium installment, for so doing would be to show special favors to one policyholder as against another. *Terry* v. *State Mut. Life Ins. Co.,* 90 S. C. 1, 72 S. E. 498; *McDonald* v. *Calkins,* 31 Ariz. 161, 251 Pac. 458; section 1843, Rev. Code 1928.

It was therefore necessary, in order that the premium be paid, that the insured pay to the defendant the additional sum of $11.43. This he tendered through his check, which was received by defendant on September 9th. But the mere payment of the premium was not of itself.sufficient to reinstate the policy. It was also necessary that the insured produce evidence of insurability satisfactory to defendant. There is no evidence whatever that the insured ever complied with this provision, and, since the burden was upon him to do so, we must presume, as a matter of law, that he did not.

If nothing further appears, it necessarily follows that the policy was never reinstated. It is urged, however, by plaintiff, and this is after all the vital question in the case, that defendant had waived the evidence of insurability, and having received and retained the delinquent premium before the death of the insured, it was estopped from contending that the policy was not reinstated.

That an insurance company may waive any of the requirements for reinstatement cannot be questioned. *Life etc. Ins. Co.* v. *Eubanks,* 19 Ala. App. 36, 94 South. 198; *Farmers' etc. Mut. Life Assn.* v. *Mason,* 65 Ind. App. 66, 116 N. E. 852; *Carr* v. *Prudential Ins. Co.,* 115 App. Div. 755, 101 N. Y. Supp. 158.

But even to reinstate a lapsed policy the courts cannot disregard the facts in a case. If it appears

plainly, distinctly, and without equivocation, that there was no waiver of the conditions required by the policy for a reinstatement, or no estoppel arising from the conduct of the insurer, the courts cannot supply what is lacking in the evidence.

Let us consider the facts of the case bearing on the issue of reinstatement. As we have said, the policy had unquestionably lapsed by the twenty-second day of August. On August 29th the defendant wrote the insured stating specifically that it had so lapsed. In this letter, however, it also stated that it would consider reinstating the policy and set forth explicitly what it was necessary for the insured to do to secure a consideration of such reinstatement. These things were to complete the statement of health, which was inclosed to him, and return that together with a check for $11.43. There can be no possible contention that he did not understand the situation, for three times previously he had allowed his policy to lapse and had had it reinstated, once through his own statement of health and twice through medical examination. He knew that a mere payment of the premium was not sufficient. But it is urged the defendant waived the statement of health by accepting the $11.43. The evidence shows that it wrote the insured immediately on receipt of the check acknowledging his remittance as a tender only, and then informed him that he must complete and return the statement of continued good health in order that restoration could even be considered. Not only this, but the receipt stated specifically that the money was only received for transmission to the home office for the account of the insured, and that it should not be held to waive any default in the payment of premium, and would be returned to the depositor upon demand if the company did not finally accept it. Since, in order that a waiver exist, it is necessary that there is an *intent* to waive the right, to hold that

on this evidence that defendant intended not to require the statement is too absurd for consideration.

There have been many cases where the effect of the retention of a delinquent premium tendered after a policy has lapsed has been considered, and the authorities are on their face in apparent conflict. We think, however, the conflict is more apparent than real. It is obvious by an examination of the cases that many courts use the term "waiver," when what they really mean is "estoppel," a very different thing, and one governed by entirely different principles.

In waiver, the essential element is an *actual intent* to abandon or surrender a right while in estoppel such intent is immaterial, the necessary condition being the deception to his injury of the other party by the conduct of the one estopped.

In the majority of the cases cited by both parties, it is evident the real issue was one of estoppel and not of waiver, and the decision in the particular case was based on whether the facts showed the necessary conditions of an estoppel. So considered, there is little, if any, conflict in the law actually applied in the different cases, the result being reached rather on the facts.

The rule of law which is apparently at the bottom of almost all of the decisions, both those upholding as well as denying the reinstatement, may be stated as follows: When an insurance company retains money tendered it in payment of a past-due premium, it will be presumed, in the absence of an affirmative showing to the contrary, that all other conditions annexed to a reinstatement of a lapsed policy have been waived. But if, at the time of the retention of the premium, it appears from the evidence that the company still intended to require a performance of those other conditions, there is no waiver. On the other hand, if it retains the tendered premium under such

circumstances that it may reasonably be said the insured was deceived to his injury by such retention, the company will be estopped from denying that there was a waiver of the other conditions, though the evidence also shows that as a matter of fact none actually existed.

It would extend this opinion to unnecessary lengths to analyze and differentiate herein the cases cited by the respective parties, such as *Equitable Life Assur. Soc. of New York* v. *Brewer,* 225 Ky. 472, 9 S. W. (2d) 206; *Business Men's Assur. Co.* v. *Richardson,* 234 Ky. 838, 29 S. W. (2d) 563; *Rasmusen* v. *New York Life Ins. Co.,* 91 Wis. 81, 64 N. W. 301; *Gould* v. *Equitable Life Assur. Society,* 231 N. Y. 208, 131 N. E. 892; *Crook* v. *New York Life Ins. Co.,* 112 Md. 268, 75 Atl. 388; *Fidelity Mutual Life Ins. Co.* v. *Price,* 117 Ky. 25, 77 S. W. 384; *Citizens' National Life Ins. Co.* v. *Egner,* 167 Ky. 476, 180 S. W. 778; *Reliance Life Ins. Co.* v. *Wolverton,* 88 Colo. 353, 296 Pac. 793; *Loftis* v. *Pacific Mutual Life Ins. Co. of California,* 38 Utah 532, 114 Pac. 134; *Millard* v. *Supreme Council,* 81 Cal. 340, 22 Pac. 864; *Lagrow* v. *Head Camp,* 75 Colo. 466, 226 Pac. 1086; *Kansas City Life Ins. Co.* v. *Phillips,* 31 Ariz. 122, 250 Pac. 882; *Pickens* v. *Security Co.,* 117 Kan. 475, 40 A. L. R. 654, 231 Pac. 1016; *Davis* v. *New York Life Ins. Co.,* (C. C. A.) 47 Fed. (2d) 1051; *Nielsen* v. *Providence Savings Assur. Society,* 6 Cal. Unrep. Cas. 804, 66 Pac. 663, and many others. We have examined them all and are satisfied the real rule applied in practically every case is that stated by us, the result varying with the facts of the particular case.

On both reason and authority we think that, under the facts of this particular case, the policy in question had lapsed and had not been reinstated before the death of the insured, for the reason that the latter had failed to comply with the provisions for reinstatement set forth in the policy and demanded by

the insurer in its letter of August 29th, and that the conduct of the latter in retaining the check for $11.43 until after the death of the insured, under the circumstances of this particular case, was in no manner, as a matter of fact or law, either a waiver of the condition in regard to the health certificate, or an estoppel from denying a waiver.

It is urged by plaintiff, and apparently the trial court gave some weight to her contention, that, since there was evidence in the record showing that the insured was in good health at the time of his death, the furnishing of the certificate of health was immaterial. The answer is that the condition of the policy in regard to reinstatement was not merely that insured should be in good health, but that, as a condition precedent to reinstatement, he should furnish evidence, not merely of good health, but of insurability to the satisfaction of defendant, a matter involving other elements than personal good health.

Since, in our opinion, the policy in question was automatically lapsed for nonpayment of premium on the twenty-first day of August, and was never reinstated thereafter, and since by its express terms the result of such lapse in the absence of an election to the contrary by the insured was to convert the policy into a paid-up term policy, without any double indemnity, and to apply the accrued dividend to the purchasing of additional paid-up term insurance, we hold that the trial court should have granted defendant's motion for an instructed verdict, and that it erred in rendering judgment for plaintiff. We need not consider the technical question of the method of procedure followed in the lower court, as the final result must be the same in any case. The judgment of the superior court of Maricopa county is reversed and remanded, with instructions to render judgment in favor of the defendant.

McALISTER, C. J., and ROSS, J., concur.