[Civil No. 3688. Filed November 2, 1936.]

[61 Pac. (2d) 1010.]

NATIONAL UNION FIRE INSURANCE COMPANY, PITTSBURGH, PENNSYLVANIA, a Corporation, Appellant, v. E. E. EPSTEIN and MARY EPSTEIN, His Wife, Appellees.

346

Messrs. Frazier & Perry and Mr. Isaac Estvold, Associate Counsel, and Mr. Charles E. McDaniel, for Appellant.

Mr. John C. Lee, for Appellees.

McALISTER, J.—This is an appeal by the National Union Fire Insurance Company, Pittsburgh, Pennsylvania, from a judgment in favor of E. E. and Mary Epstein upon a policy of fire insurance and from an order denying its motion for a new trial.

The facts shown by the record are substantially these: On October 4, 1926, Mary and E. E. Epstein purchased from M. H. Baskin, Jr., under a contract of sale for a consideration of $4,500, a small tract of land north of Phoenix upon which was located a dwelling-house. Seven hundred and fifty dollars of this amount was paid down and the balance of $3,750 was to be discharged in monthly installments of $35. On November 4, 1930, M. H. Baskin, Sr., and E. E. Epstein went to the Phoenix office of the defend-

ant National Union Fire Insurance Company, Pittsburgh, Pennsylvania, hereinafter called the company, and applied for a policy of fire insurance on the dwelling-house situated on this property. They asked the agent, F. S. Henrich, if he would cover the dwelling-house of Epstein with a policy in the sum of $2,500 and, being familiar with it, he said he would. Thereupon Henrich inquired, "Who is the title to this property in?" and Baskin, Sr., replied that it was in him. The agent then said, "There will be a contract of sale clause to Mr. Epstein," and to this Baskin replied, "That is right." A policy covering the dwelling in the sum of $2,500 for a period of three years was then written and E. E. Epstein paid the premium of $46.50. It contained, among other things, the following provision:

"National Union Fire Insurance Company
Pittsburgh, Pa.
"(Incorporated Feb. 14.—1901)
"Amount $2,500.00 Rate 1.86 Premium $46.50

"In Consideration of the Stipulations Herein Named and of Forty Six and 50/100 Dollars Premium Does Insure M. H. Baskin, Sr., for the term of Three Years from the 4th day of November 1930 at noon to the 4th day of November 1933 at noon against all direct loss or damage by fire, except as hereinafter provided, to an amount not exceeding Two Thousand Five Hundred and no/100 Dollars to the following described property while located and contained as described herein, and not elsewhere, to-wit: . . .

"It is understood that E. E. and Mary Epstein (hereinafter termed Vendee) has an interest in the within described property by virtue of contract of sale from M. H. Baskin, Sr., (hereinafter termed Vendor).

"If loss under this policy be payable to a mortgagee, trustee or beneficiary under deed of trust, the proceeds of this policy shall be first applied to the payment of such payee's interest, and the balance, if any, subject to all the terms and conditions of this policy, shall

be payable to said vendor and/or said vendee in the manner hereinafter provided in paragraphs designated 'First' and 'Second' hereof. If this policy be not payable to a mortgagee, trustee, or beneficiary under deed of trust, the proceeds of this policy, subject to all its terms and conditions, shall be payable to said vendor and/or said vendee as follows:

"First: To said Vendor, to an amount not exceeding the balance unpaid, at the time of loss, upon the contract of sale above referred to; and

"Second: The balance, if any, to said Vendee.

"Provided always. . . . "

On June 19, 1933, the dwelling was completely destroyed by fire, the Epsteins then owing $2,640.46 on their contract. On July 28th thereafter M. H. Baskin, Sr., filed with the company a "Sworn Statement in Proof of Loss" in which he stated, among other things, that his interest in the property was sole and unconditional ownership, no other person having any interest therein except it was subject to a mortgage in his favor in the amount of $4,000, payable $35 monthly; that since the issuance of the policy there had been no assignment thereof or any change of ownership of the property described or of his, the insured's, interest therein "except; legal and record title in name of Mortimer H. Baskin, Jr."; that the value of the building at the time of the fire was $1,750 and that this, being the amount of loss, was the sum claimed by him under the policy.

About three weeks later, or on August 17, 1933, the Epsteins executed and filed with the company a "Proof of Loss" in which they stated, among other things, that the dwelling-house was totally destroyed by fire; that the cash value of the building at the time was $2,500 and this, being the actual loss, was the sum claimed by them under the policy; that they understood M. H. Baskin, Sr., had theretofore filed proof of loss for a smaller amount but that they objected

to settlement under the policy for a sum less than $2,500; that since the policy was issued there had been no transfer or encumbrance of the property or any change in the title "except as above stated, M. H. Baskin, Sr., (vendor)."

The parties were unable to agree on the amount of loss and upon the suggestion of the company that an appraisal of the property be had, the respective parties selected appraisers but they were unable to agree on an umpire, so at the suggestion of the plaintiffs, one was appointed by a judge of the superior court of Maricopa county. For some reason, however, not material here, the appraisal failed and on January 29, 1934, the Epsteins commenced an action against the company on the policy and made M. H. Baskin, Sr., a defendant, the complaint referring to him as the vendor of the property and the assured named in the policy. Before trial, however, and on May 11, 1934, the Epsteins paid M. H. Baskin, Jr., the amount remaining due under the contract of sale and received a deed to the premises.

M. H. Baskin, Sr., and the company agreed that $1,750 was the extent of the loss and on September 19, 1934, the latter deposited this sum in court. It was later, on motion of the plaintiffs, released to them by the court.

In their original complaint the plaintiffs had alleged that the company had insured M. H. Baskin, Sr., and themselves against loss of the dwelling-house by fire, they being the vendor and vendees of the property respectively, and to this pleading the defendant, after demurring generally and specially, interposed a plea in abatement and an answer in which it alleged that at the time of the fire the interest of M. H. Baskin, Sr., in the premises exceeded $2,500; that he and the company agreed that the loss was $1,750; that the company had been able and ready at all times to pay

this and M. H. Baskin, Sr., willing to accept it; that under the terms of the policy the plaintiffs had no interest in its proceeds until the interest of M. H. Baskin, Sr., in the property had been reduced to less than $2,500.

In subsequently filed pleadings the plaintiffs alleged that they had purchased the property from M. H. Baskin, Jr., and taken out the policy of insurance to secure him for the purchase price; that he and they each had an interest in the property at the time of the fire, his interest being in the sum of $2,640.46, but that they had since paid him this sum which was the balance of the purchase price, that M. H. Baskin, Sr., had at no time after the purchase of the property by plaintiffs any interest whatever in either the property or the proceeds of the policy. They asked for the full amount of the policy, 15 per cent. penalty for failure to pay loss, as provided by statute, and an attorney's fee of $500.

At the trial which was had before the court sitting without a jury evidence was introduced by the plaintiffs showing that after they purchased the property and prior to the issuance of the policy they put $1,100 in improvements on the dwelling-house and that its value at the time of the fire was at least $2,800, the testimony of some of the witnesses placing it at $3,300. The court rendered judgment in favor of the plaintiffs for the full amount of the policy, penalties and an attorney's fee of $472.50, and it is from this judgment and the denial of its motion for a new trial that the company appeals.

A number of assignments have been made and some ten propositions of law set forth to support them, but it is unnecessary to discuss these separately. The appeal rests largely on one basic proposition and that is the contention that when appellees purchased the insurance policy they concealed from and misrepre-

sented to the appellant a material fact, namely, that M. H. Baskin, Jr., and not M. H. Baskin, Sr., was the owner and vendor of the property. The position of appellant is that under the following provision of the policy the failure to give the company this information at that time amounted to a concealment or misrepresentation of a material fact and rendered the policy invalid and unenforceable:

"This entire policy shall be void if the insured has concealed or misrepresented, in writing or otherwise, any material fact or circumstance concerning this insurance or the subject thereof; or if the interest of the insured in the property be not truly stated herein; or in case of any fraud or false swearing by the insured touching any matter relating to this insurance or the subject thereof, whether before or after a loss."

That there was a misrepresentation or concealment by appellees is based upon these facts: When appellee, E. E. Epstein, and M. H. Baskin, Sr., went to the Phoenix office of the insurance company on November 4, 1930, to procure a policy on the dwelling-house and M. H. Baskin, Sr., stated, in reply to a question of the agent, that title to the property was in him and that he was its vendor, Epstein remained silent, notwithstanding he and his wife had purchased the property from M. H. Baskin, Jr., the son of M. H. Baskin, Sr., four years prior thereto and had made their payments up to that time to him or his agent. Appellant contends that Epstein should have spoken up and disputed the statement of Baskin, Sr., and informed the agent that title to the property was in Baskin, Jr., and that his failure to do so avoids the policy, because the company had the right to know this then in order that it might decide whether it would insure Baskin, Jr., against loss, the fact that it might have insured him as readily as his father against loss on the same property being wholly

immaterial. The company, it is argued, was under no greater liability to pay a loss than it would have been to the purchaser of property covered by a policy of insurance that had not been assigned to the purchaser with the consent of the insurer prior to the destruction of the property by fire. An insurance policy, it is true, is a contract whose terms govern any action brought on it, *Equitable Life Assur. Soc.* v. *Pettid,* 40 Ariz. 239, 11 Pac. (2d) 833, and is in its nature personal, that is, it is an agreement insuring not the property itself but the owner against its loss or damage by fire, and, hence, cannot be changed after issuance by substituting one who later purchases the property for the insured named in the policy, except upon consent of the insurer. *Brogoitti et al.* v. *Walter,* 43 Ariz. 290, 30 Pac. (2d) 835.

It occurs to us, however, that the facts do not by any means compel, even if they may be said to justify, the conclusion that appellees concealed or misrepresented that Baskin, Jr., was the owner and vendor of the property. In fact, they show that E. E. Epstein made no representation at all on the subject but merely did not dispute Baskin, Sr., when he said the title was in him. According to the record Mr. Henrich, the agent to whom they went to buy the policy, was well acquainted with the property and with the fact that appellees were buying it on contract from the "Baskins." It discloses also that Epstein told him at the time that the papers, the contract of sale and the deed, were in escrow with the Arizona Title & Trust Company, that Epstein did not know until May, 1934, when M. H. Baskin, Jr., went to the office of the Home Owners Loan Corporation to accept the bonds in payment of the balance of the purchase price that M. H. Baskin, Sr., was not the owner of the property. While he had purchased it from Baskin, Jr., four years prior to that time he perhaps did not know but that

some change in interest had taken place in the meantime between father and son, and there certainly was no reason whatever why he should have misled the agent, or have failed to tell him from which of them he had bought it and made his payments to if he had thought it at all material. The question was not asked him and the very fact that he informed Mr. Henrich where the papers were showed no concealment on his part of anything they contained, or an intent to conceal it, and this is true even though the insurance company was not called upon to investigate elsewhere to ascertain the ownership of the property or who was selling it.

Whether, however, the facts may be construed as showing concealment by appellee of the ownership of Baskin, Jr., is wholly immaterial in view of the fact that appellant admitted shortly after the fire its liability on the policy. It did this by agreeing that the "Proof of Loss" filed by Baskin, Sr., showing the loss to be $1,750 was correct, offering to pay it and, in fact, depositing this sum in court in settlement of the claim, all of which was done after the company had been advised by M. H. Baskin, Sr., himself in his "Proof of Loss" that the legal title to the property was then in M. H. Baskin, Jr. The company could not admit liability on the policy in any sum and by so doing limit its obligations thereunder, because if it was liable at all, it was liable for the full amount of the loss, whatever that might be, that is, up to the extent of the policy. It was not offering to pay as a gratuity or as a compromise but in settlement of a binding obligation.

In dealing with Baskin, Sr., in determining the amount of loss after it had learned from him through his sworn statement that he was not the owner of the property but that Baskin, Jr., was, it evidently acted upon the theory that it was justified in doing so be-

cause he was named in the policy as the insured and as the vendor of the property. It will be observed, however, that this mistake, for clearly it was nothing more, did not lead it to deny liability on the policy; it waived this error instead and proceeded to confer with Baskin, Sr., in reaching an agreement as to the amount of loss, notwithstanding his known lack of ownership, and in doing so ignored the vendees who had purchased the insurance and paid for it, and who by that time had paid about $3,000 on the purchase price of the property, including the land. In support of its contention that it had the right to deal with Baskin, Sr., in making an adjustment of the loss and that it is protected in whatever settlement was reached between them, appellant cites *Hartford Fire Ins. Co. v. Evans,* (Tex. Civ. App.) 255 S. W. 487, 490, in which the court does say: "Ordinarily, also, the insurance company would be justified in dealing with the person to whom the policy was made payable and protected in any adjustment of loss under the policy made with such person." The opinion states further, however, that if the insured should fail to do his duty in the matter of collecting the insurance he himself would be liable to the beneficiary for the loss sustained on such account, and then uses the following language which we think particularly applicable to the facts confronting us here:

"We think it true, also, that if the insurance company knew of the rights of the beneficial owner and that they were being disregarded in the settlement, then such settlement would not protect it against the claim of such beneficiary. [Citations.] The insurance company, in such case, would be a participant with the trustee in the breach of his duty to the beneficiaries. It reaped the benefit of such breach of duty, and under the authorities, would be, we think, liable to the beneficiary to the same extent as the trustee."

It is perfectly clear that the company knew when it was dealing with Baskin, Sr., that appellees were buying the property on contract, that they had purchased the policy of insurance and paid the premium thereon, and that they were necessarily greatly interested in the proceeds of the policy. It knew also that the insurance was payable first to the seller to the extent of the purchase price still due him and, second, to the purchasers in whole or in part, depending upon whether they still owed anything on the purchase price, but in either event, one as much as the other, that the amount of the loss was still tremendously important to appellees because every dollar paid to the seller by the company, even though to the extent of the full face value of the policy, was a discharge of the purchase price *pro tanto*. Knowing these facts, the company was protected in its agreement with Baskin, Sr., in settling for $1,750 only if that amount represented the actual loss. If it did not, the rights of appellees were disregarded by Baskin, Sr., in agreeing to it, and the company became a participant with him in that act and will reap the benefit of his breach of duty to appellees if the settlement is approved.

Did $1,750 represent the full loss of appellees? The property, consisting of a house, which was completely destroyed, and several acres of land, was purchased for $4,500 and additional improvements in the sum of $1,100 were placed on the dwelling by appellees before the insurance was secured. The evidence as to the value of the house is undisputed, and the lowest any witness placed it was $2,800 and the highest, $3,-300, several naming an amount in between. This being true, it is clear that $1,750 did not represent the actual loss and that the court was justified in finding, as it did, that the loss suffered by appellees exceeded $2,500.

 The only other question calling for consideration is the contention that the court was not justified in imposing the statutory penalty of 15 per cent. for failure to pay the loss, and an attorney's fee of $472.50. It occurs to us that in dealing with Baskin, Sr., after it knew he was not the owner of the property and in agreeing with him to a settlement for less than the actual loss, thus disregarding the interest of appellees, the company was attempting to settle an actual loss of $2,500 for very much less, namely $1,750, and that in consequence of this unjustified position it became necessary that appellees take the matter through both the trial and appellate courts to secure their rights. Under such facts it is our view that the trial court did not commit error in imposing the statutory penalty and in awarding an attorney's fee of $472.50, which, under the circumstances, was not unreasonable.

Several other assignments are made but in view of the conclusion reached upon those discussed it is not necessary to consider them.

The judgment is affirmed.

LOCKWOOD, C. J., and ROSS, J., concur.