BAUMAN and wife, Appellants, vs. MIDLAND UNION INSURANCE COMPANY and another, Respondents.

*April 8—May 6, 1952.*

450

For the appellants there were briefs by *Lueck, Skupniewitz & Lueck* of Beaver Dam, and oral argument by *A. W. Lueck*.

For the respondents there was a brief by *Wilkie, McCusker & Wilkie* of Madison, and *George A. Hartman, Robert Hartman,* and *Leo C. Hartman* of Juneau, and oral argument by *Horace Wilkie*.

CURRIE, J.   The plaintiffs' appeal presents the sole question of whether there was prejudicial error in the instructions of the trial court to the jury which justified the trial court in granting a new trial.

The particular instructions to the jury, which the trial court later determined were erroneous, read as follows:

"If there is any doubt as to the meaning of any term or word used in an insurance policy, the doubt will be resolved in favor of the one who is insured by the policy rather than in favor of the insurance company." And

"When a policy of insurance is capable of two meanings, that which is most favorable to the one who is insured by it is always to be adopted."

These instructions were given by the trial court as a result of a request by plaintiffs' counsel.

The general rule is that the construction of words and clauses used in an insurance policy, where such construction does not depend upon extrinsic facts, presents a question of law for the court to decide, and is not for the jury. 29 Am. Jur., Insurance, p. 1151, sec. 1530.

In *Thurston v. Burnett & Beaver Dam Farmers' Mut. Fire Ins. Co.* (1898), 98 Wis. 476, 478, 74 N. W. 131, this court held there was no jury question in construing the policy provisions there presented and stated:

"The case comes clearly within the rule that where language is plain and unambiguous, the apparent import of the words must govern, and the rule that where there is no uncertainty as to the meaning of the words used in the contract,

and where such uncertainty exists but there is no extrinsic evidence or circumstance bearing on the subject to be considered in determining the meaning attributed to them by the parties when the contract was made, the proper interpretation of the words and construction of the contract are solely for the court. *Ganson v. Madigan,* 15 Wis. *144; *Murphey v. Weil,* 92 Wis. 467. Therefore the trial court erred in leaving the construction of the contract to the jury."

The following statement of the Arizona supreme court appearing in its decision in *Equitable Life Assur. Soc. v. Pettid* (1932), 40 Ariz. 239, 248, 11 Pac. (2d) 833, is particularly pertinent to the situation presented in the instant case:

"And the rule that the policy is construed most strongly against the insurer applies only to the language of the contract and not to the facts of the case."

No extrinsic evidence was offered as to what the parties to the two insurance policies, upon which plaintiffs grounded their action, intended by use of the word "explosion" in the extended coverage clauses of the policies, and it is doubtful if such evidence had been offered whether the same would have been admissible. It was clearly the function of the trial court to interpret the meaning of the word "explosion" and to properly instruct the jury as to the proper meaning of such word in that part of the charge dealing with the first question of the special verdict. The effect of the instructions given, as hereinbefore quoted, was to leave to the jury the determination of the proper interpretation of the word "explosion" in the policy.

The plaintiffs claim that the silo burst as a result of an explosion of carbon-dioxide gas formed by the fermentation of the silage within the silo. The trial court did properly instruct the jury that if it believed that plaintiffs' silo was destroyed by reason of its own defects from overloading, or from the sheer weight of the silage contained therein, the

jury should answer question 1 of the special verdict "No." Nevertheless the giving of the further instructions, that if there was any doubt as to the meaning of any word in the policies, such doubt should be resolved in favor of the insured and against the insurance companies, was highly prejudicial and would warrant the granting of a new trial.

The defendants, by their motion for review, raise the question that it was error for the trial court to have denied defendants' motion for directed verdict made at the conclusion of the receipt of evidence in the trial below. In order to pass upon this contention it is necessary to review the evidence in the case bearing on the question of whether the bursting of plaintiffs' silo was caused by an explosion. Counsel for the plaintiffs in their reply brief state:

"We never contended that bursting from silage pressure is an explosion. There is no intimation in our brief to that effect.

"We make but one contention, and it is that there was an explosion of the silage inside the silo due to the gas pressure."

Therefore the question on this issue resolves itself into whether there is any credible evidence in the record that would have sustained a finding by the jury that there was an explosion of gas within the silo that caused it to suddenly burst.

The plaintiffs are the owners of a two-hundred-acre farm near Marquette in Green Lake county, having moved onto such farm in 1943. The silo was a concrete cylindrical structure, forty feet high and twelve feet in diameter on the inside. It had been built in 1921 with the use of wood forms. The procedure was to set the forms for the silo wall and then pour the fresh concrete into the forms to set. A total of six feet was poured each day, two feet at a time, and three times per day. The walls were eight inches thick and there was no vertical reinforcement in the concrete. Horizontal re-

inforcement was supplied by three strands of No. 9 steel wire, twisted together and placed in two-foot intervals in the poured concrete as the silo wall was formed.

The dome-like roof also was made of concrete and there was a canopy vent at the peak of the roof and a window in the roof that was big enough for a man to crawl through even when the pipe from the blower was run through the window. The silo stood on the north side of the barn and at its nearest point the silo wall was about two and one-half feet from the barn. A feed room, also constructed with eight-inch concrete walls, extended from the silo to the barn. There was a two-foot-wide opening in the southwest silo wall which extended from a concrete curb about eight to ten inches above the feed-room floor up the whole side of the silo to the roof. Above the ceiling of the feed room, this opening was surrounded by the customary "U" shaped chute which is typical of the usual Wisconsin farm concrete silo.

As the silo was filled, wooden doors were placed, one above the other, closing off the two-foot-wide opening in the silo wall from the feed-room floor to the top of the chute, and these were held in place by steel rods anchored in the concrete. The feed-room floor was five feet above the concrete floor of the silo itself which was buried below ground level.

The 1948 silo-filling process began on or about September 1st, and the plaintiffs had been filling the silo for about ten days before September 10, 1948, which is the date the accident occurred which the plaintiffs claim to have been an explosion. The corn was chopped in the field and brought by wagon to the farmyard where it was pitched into the blower that was located on the north side of the silo and blown into the silo through the blower pipe which extended up from the blower through the window at the top of the silo.

On September 10, 1948, the silo-filling process was nearing completion, and that morning the last wooden door at the top of the chute had been put in place and the silo was almost filled. About noon on September 10th, the plaintiff A. Bernard Bauman was in the cornfield a considerable distance from the silo operating the chopper, while Mrs. Bauman and an eleven-year-old son, Kent Bauman, were operating the tractor which ran the blower and were pitching chopped corn into the blower, being about ten feet away from the silo. Another boy, Victor Lucas, was up in the top of the silo.

Suddenly the silo wall ruptured with a loud report or "boom." Mrs. Bauman and her son went around to the east side of the silo where they noticed a crack in the silo wall three to five inches wide when they first saw it running straight up and down, and silage was pouring out of the crack. Kent Bauman and Victor Lucas summoned Mr. Bauman from the field and when the latter arrived he found a crack about eight inches wide running straight up and down from the top of the silo to a point twenty inches above the ground and that the silo was slowly spreading. Shortly thereafter the whole northeast section of the silo wall fell in a northeasterly direction. A little while later the southeast section of the silo wall fell onto the barn and several huge pieces of concrete went through the barn roof and side and onto the barn floor. A major part of the silage fell out of the silo in the direction which the walls had been pitched.

After the silage had been cleaned up, two large pieces of concrete were found imbedded in the ground on the southeast side of the silo, between the silo and the barn, there being about twenty inches from the exterior silo wall to their nearest point. The larger of the two pieces was approximately three and one-half feet long. The plaintiffs place great stress on the location of these two pieces of concrete, contending that their location establishes that an explosion

took place which caused them to be "blown" into the position in which they were found. As a good part of the southeast portion of the forty-foot silo wall did collapse we fail to see how the location of these two pieces of concrete constitutes any credible evidence for establishing that an explosion of gas took place within the silo which caused the silo to burst. If the silo burst as a result of structural defects from the pressure of the silage alone, resulting in the southeast wall of the silo thereafter to collapse, the location of such two pieces of concrete would be fully accounted for without having to resort to the theory of an explosion. It is significant that none of the witnesses who examined the silo after the first vertical crack appeared, and before any of the silo wall collapsed, testified to having seen these two pieces of concrete. Mr. Bauman testified that at that time he saw nothing on the ground but a little silage about one and one-half inches deep.

In addition to the fact that when the silo wall first burst it did so with a large report, and the location of the above-described two pieces of concrete, the plaintiffs rely on the testimony of four expert witnesses to substantiate their claim that there was sufficient credible evidence in the record of an explosion to make an issue for the jury. The plaintiffs' four expert witnesses were all either graduate chemists, or chemical engineers. All testified that the fermentation of silage is the work of bacteria and that as a result of such fermentation carbon-dioxide gas is produced. They further stated that this gas produces pressure and, if the gas is contained in a "closed container" and sufficient pressure is produced, the walls of the container will burst or disintegrate if the container is not strong enough to withhold the pressure.

None of plaintiffs' expert witnesses had ever conducted any experiments with silage. On cross-examination the witness Roger Patrick admitted that carbon-dioxide gas will

permeate any opening, or any porous material, and he could not visualize any opening too small for this gas not to pass through. The witness Oscar Link admitted on cross-examination that such gas will permeate loose vegetable matter and will rise if there is any opening for it to go through. The witness Frank Free stated that such gas will permeate porous material. None of plaintiffs' expert witnesses ventured any opinion as to whether such gas would, or would not, permeate through silage and escape through cracks between the wooden doors of the chute, or out the open window at the top of the silo. Neither did they venture any opinion that the accident to plaintiffs' silo was caused by the result of pressure of carbon-dioxide gas.

The defendants called as their expert witnesses Professors William H. Peterson and Stanley A. Witzel of the faculty of the College of Agriculture of the University of Wisconsin. Dr. Peterson's field is biochemistry and he has done extensive work and experimentation with silage. He stated that silage is porous and that the carbon-dioxide gas which results from the fermentation of silage tends to move to the top of the silo through the silage, and he further testified that if the silage juices leaked out between the openings of the wooden doors of the silo, so would the gas. (Mr. Bauman testified that each year from 1943–1948, juices would seep onto the feed-room floor which came from the silo doors, and that, to the best of his recollection, juices had seeped out onto the feed-room floor in the silo filling of 1948.) Dr. Peterson further testified that he had conducted experiments as to gas pressure in silage by boring a hole in a stave silo about four feet above ground level and inserting a tube into the silage with the result that no gas came rushing out, and in order to obtain a sample of gas it was necessary to apply suction to the tube in order to draw out the sample, and that the same experiment was repeated at different times over a spread of one hundred thirty days. It was his opinion with

reasonable certainty that there were no gas pockets in silage of any appreciable size. In answer to a hypothetical question correctly stating the facts as they existed with respect to plaintiffs' silo on September 10, 1948, he stated that it was his considered opinion that there would not be sufficient carbon-dioxide-gas pressure in the silage to cause a rupture of the silo walls.

Professor Witzel is a graduate civil engineer and has had extensive experience in silo construction and is a member of the American Concrete Institute committee on silage specifications. He testified that the Bauman silo when filled with silage, as it was on September 10, 1948, would contain from one hundred to one hundred ten tons of silage, and near the bottom of the silo the pressure would be four hundred forty to eight hundred eighty pounds per square foot. He further stated that ordinarily concrete is not given credit for carrying tension and steel reinforcing is used for carrying the tension. He further testified that the steel reinforcing in plaintiffs' silo was only about twenty-five per cent of the amount that would be considered adequate for minimum design to carry the pressure from one hundred to one hundred ten tons of silage. He further stated that when pressure is great enough to break concrete it fractures with a loud report which can be heard for some distance. In answer to a hypothetical question stating the facts as they existed with respect to plaintiffs' silo on September 10, 1948, it was his opinion that there would have been enough pressure from the weight of the silage alone to cause the silo wall to rupture. This expert also pointed out that water will go down through a silo full of silage overnight. It is therefore apparent that if there are sufficient openings in silage to permit water to percolate down through from top to bottom overnight, any gas would escape through these same openings in the silage.

After a careful review of all evidence in the case bearing on the question of explosion, which evidence has been herein summarized at considerable length, it is our conclusion that there is no credible evidence in the record on which a jury could find that the bursting of the wall of plaintiffs' silo was caused by an explosion, or by the pressure of gas. Therefore it was error for the trial court not to have granted defendants' motion for a directed verdict.

*By the Court.*—Order reversed and cause remanded with directions to dismiss plaintiffs' complaint. The brief of respondents exceeds fifty pages and counsel has made application to tax printing costs of the entire brief. Such permission is granted under Rule 10 (sec. 251.264, Stats.).