Harry KATZE, Plaintiff-Appellant,

v.

RANDOLPH & SCOTT MUTUAL FIRE INSURANCE COMPANY,
a/k/a Randolph-Scott-Westford Insurance Company,
Defendant-Respondent.†

Court of Appeals

*No. 81–1073. Argued January 8, 1982.—Decided January 19, 1983.*
(Also reported in 330 N.W.2d 232.)

† Petition to review granted.

For the plaintiff-appellant there were briefs by *John R. Miller* and *Miller & Miller* of Portage, and oral argument by *John R. Miller*.

For the defendant-respondent there was a brief by *Clyde C. Cross* and *Cross, Mercer and Maffei* of Baraboo, and oral argument by *Clyde C. Cross*.

Before, Gartzke, P.J., Bablitch, J. and Dykman, J.

BABLITCH, J. Harry Katze brought this action under the theft provisions of his farmowner's insurance policy to recover the value of cattle he sold in exchange for a worthless check. The action was tried to a jury, which rendered a verdict in his favor. Katze appeals from a judgment dismissing his complaint on post-trial motions notwithstanding the verdict. The trial court found, as a matter of law, that Katze suffered no loss by "theft" within the meaning of the policy. We reverse.

The material facts are not in dispute. Katze is a farmer whose primary occupation is buying and selling cattle. Since 1973 he has bought and sold an average of 1,100 cattle per year, at prices of between $450 and $800 per head, for an annual gross of $700–800,000.

His 180 acre farm is set up as a dairy operation. At any given time there may be anywhere from zero to sixty head of cattle on the farm, awaiting sale. These he feeds and cares for with farm crops and produce which he

raises with the help of his son. The cows are milked and the milk is sold. An average of thirty cows are maintained on his premises. Since 1973 he has kept no cattle on his farm which were not held for sale to the public.

Since 1973 Katze has had a farmowner's insurance policy issued by the respondent. This policy was renewed in 1977 after discussions between Katze and one of respondent's agents. The agent testified that when he filled out the renewal application he was fully aware that Katze was using his farm for cattle dealing and that Katze had fully disclosed the nature of its operation. The agent said he "purposely" filled in the renewal application to indicate that Katze was a livestock dealer in response to the form question: "What business, if any, does the applicant conduct on the above premises other than farming?"

The agent testified that he and Katze specifically discussed coverage for the cattle. The agent was aware Katze wanted his cattle covered and had told Katze that they would be covered while they were on his land. The schedules of farm personal property attached to the application and to the policy each list thirty dairy cows, valued at a total of $18,000 ($600 per cow) as a part of the blanket coverage. This increased by $3,000 the value of the cows stated in Katze's former policy and resulted in a slight increase in his premium, which was charged at a rate of $2.80 per each one thousand dollars of covered property.

The policy insured against loss of covered property by "theft," which the policy defined as "any act of stealing." The policy excluded theft loss "(a) if committed by an insured; (b) in or to a building, material or supplies therefor; (c) by inventory shortages; (d) by wrongful conversion and embezzlement; (e) by escape; or (f) by mysterious disappearance." Covered property was specified as "farm personal property usual and incidental to the operation of a farm."

While the policy was in effect one Phillip Laeske contacted Katze in order to purchase some cattle. He represented to Katze that he was about to commence a dairy operation on his mother's farm in Juneau, Wisconsin, and that he was obtaining financing from an uncle in Chicago. He agreed to purchase fifty head of cattle and to pay Katze on delivery. Katze delivered these over the course of three days to three separate locations specified by Laeske. Laeske was not present at the farm where the final delivery was made, although he had agreed to be.

The day after the final delivery of the fifty head Laeske called Katze to order an additional twenty-two head. Katze insisted he pay for the cattle previously delivered. The following day Laeske gave Katze a check for all seventy-two cattle in the amount of $58,325. The check was not certified. Katze delivered the additional twenty-two cattle and, subsequently, an additional twelve for a total of eighty-four head sold to Laeske. After the final delivery, Laeske's check bounced. For several subsequent days Laeske stalled Katze and Katze's attorney by claiming that the money would soon be deposited in his account. During that time, Laeske sold most of the cattle. Katze eventually recovered twenty-one head; he lost sixty-three head.

A civil suit against Laeske, which came to trial prior to the present action, resulted in a money judgment against him. Only $6,200 was recovered from Laeske, through garnishment. Laeske was also convicted of issuing a worthless check under sec. 943.24, Stats. The district attorney testified that she brought that charge against him rather than charging theft by fraud under sec. 943.20(1)(d),[1] because she thought the latter charge

---

[1] Section 943.20(1)(d), Stats., subjects to criminal penalty any person who:

Obtains title to property of another by intentionally deceiving him with a false representation which is known to be false, made

would require more investigation than her understaffed office could immediately provide. Laeske testified in the present action that he had never intended to commence dairy farming; that he had never intended to pay Katze for the cattle, or to return them; and that he had deliberately defrauded Katze in order to raise money to pay creditors who were pressuring him.

In a special verdict the jury determined that Katze sustained a direct loss of sixty-three dairy cows by theft within the meaning of the policy; that a reasonable person in Katze's position would understand that fifty cows were covered by the policy; and that such a reasonable person would understand that the maximum coverage limit under the policy was $18,000.

The trial court had reserved ruling on motions by both parties to answer the verdict questions as a matter of law at the conclusion of the testimony. After the verdict, the trial court issued a memorandum decision determining as a matter of law that the policy provided no coverage for Katze's loss. It found nothing in the policy to indicate that it covered Katze's livestock dealer operations, as opposed to his farming. It also concluded that the term "theft" did not encompass theft by fraud or "swindling," and that no reasonable person could have assumed that the policy covered unsuccessful credit transactions abetted by a "lack of prudence" such as Katze displayed in not demanding a certified check.

This court owes no deference to the trial court's resolution of issues of law. *First Nat. Leasing Corp. v. Madison*, 81 Wis. 2d 205, 208, 260 N.W.2d 251, 253 (1977). The interpretation of an unambiguous contract is a matter of law to be determined from the words of the con-

tract, without resort to extrinsic evidence. In construing an insurance contract, words are to be given their common meaning as they would have in the mind of an ordinary person. *Hochgurtel v. San Felippo,* 78 Wis. 2d 70, 79, 253 N.W.2d 526, 530 (1977). Any ambiguity in the contract is to be construed against the insurance company which drafted the contract. *Stanhope v. Brown County,* 90 Wis. 2d 823, 849, 280 N.W.2d 711, 722 (1979). Words are ambiguous when they are reasonably susceptible of more than one construction. *Garriguenc v. Love,* 67 Wis. 2d 130, 135, 226 N.W.2d 414, 417 (1975). Where a provision is ambiguous and there is no extrinsic evidence bearing on the meaning intended by the parties, the proper interpretation is to be determined by the court as a question of law. *Bauman v. Midland Union Ins. Co.,* 261 Wis. 449, 452, 53 N.W.2d 529, 530 (1952).

No extrinsic evidence was offered in this case as to what the parties intended by the theft provision. The term "theft" is ambiguous. It is reasonably capable of being understood in its broadest sense as any wrongful or unlawful taking of another person's property, including theft by fraudulent procurement of that property. It is also reasonably understood in the narrower sense of taking property without the owner's consent. Both broad and narrow definitions can be found in reputable dictionaries.[2] The Wisconsin theft statute, sec. 943.20,

---

[2] *See, e.g., Webster's Third New International Dictionary,* (1976), which defines "theft" as follows:

1a: the act of stealing; *specif.* the felonious taking and removing of personal property with intent to deprive the rightful owner of it . . . 2: the taking of property unlawfully (as by robbery, embezzlement, fraud) . . . .

*Black's Law Dictionary* (5th ed 1979) contains the following definition:

A popular name for larceny. . . . The fraudulent taking of personal property belonging to another, from his possession, or

Stats., separately identifies theft by fraud in subsec. 943.20(1)(d), thus distinguishing it from other types of theft. All forms of theft identified by the statute are subject to identical penalties under sec. 943.20(3), however.

We find no Wisconsin case construing the term "theft" in the context of an insurance risk. Courts in several other jurisdictions have addressed this question, however, and most of them have decided in favor of coverage. *Steinbach v. Continental Western Ins. Co.*, 237 N.W. 2d 780, 782 (Iowa 1976), is directly on point with this case. The Iowa Supreme Court held that an insured who sold cattle in exchange for a forged check had suffered a covered "theft" under a policy provision almost identical to the provision here at issue. It reasoned that when the term "theft" is not adequately defined by the policy, the term "'has its meaning as a word of general and broad connotation covering any wrongful appropriation of another's property to the use of the taker,'" quoting *Long v. Glidden Mutual Insurance Association*, 215 N.W. 2d 251, 273 (Iowa 1974).

Similarly, the Nebraska Supreme Court has held that a farmowner's policy insuring livestock against "theft" covers unlawful appropriation as well as larceny, and could extend to "pilferage, swindling, embezzlement, conversion, and other unlawful appropriations." *Raff v. Farm Bureau Insurance Co. of Nebraska*, 149 N.W.2d 52, 55 (Neb. 1967). *Accord: Gomez v. Security Insurance*

from the possession of some person holding the same for him, without his consent, with intent to deprive the owner of the value of the same, and to appropriate it to the use or benefit of the person taking.

It [has] also [been] said that theft is a wider term than larceny and that it includes swindling and embezzlement and that generally, one who obtains possession of property by lawful means and thereafter appropriates the property to the taker's own use is guilty of a "theft". . . . [Citations omitted.]

*Company of Hartford,* 314 So. 2d 747, 749 (La. App. 1975) ("theft" includes "a taking by fraudulent conduct under circumstances which evidence an intent to steal"); *Kilpatrick v. Motor Ins. Corp.,* 561 P.2d 472, 474 (N.M. 1977) ("theft" in an insurance policy is to be broadly construed and means taking, without authority, of another's property). *Munchick v. Fidelity & Casualty Co. of New York,* 209 N.E.2d 167, 170 (Ohio 1965) ("[t]heft is a broader term than larceny and includes other forms of wrongful deprivation of the property of another"); *P.E. Ashtan Company v. Joyner,* 406 P.2d 306, 308 (Utah 1965) (" 'theft' . . . [includes] the wilful taking or appropriation of one person's property by another, wrongfully and without justification . . .";

The respondent relies on *Great American Indemnity Company v. Yoder,* 131 A.2d 401 (D.C. Mun. Ct. App. 1957), which held that a standard theft provision did not cover the loss of an automobile sold in exchange for a worthless check. Noting that the purchaser's conduct fell within the statutory crime of theft by false pretenses, the court nonetheless determined that the "popular definition" of theft did not include voluntary transfers of title to the property. The court stated:

Appellee had every opportunity in the course of this transaction to demand cash or payment by certified check. To extend the meaning of "theft" to include a taking of this kind is in effect to hold that the policy insures the consideration in business deals or that Appellee is insured against a lack of prudence if she makes a bad bargain. We do not think that this was the risk contemplated by the parties under the policy.

131 A.2d 403.

The respondent urges that Katze's loss was in the nature of a business or credit loss which was not contemplated by the parties as a covered risk, and which the respondent—a town mutual insurance company—is stat-

utorily precluded from insuring under sec. 612.31(4)(j) Stats.[3] If this farmowner's policy is extended to cover the loss at issue, respondent insists, Katze receives protection "of a nature and magnitude that the ordinary farmer does not have." The respondent also contends that the general rule that policies will be construed liberally in favor of coverage should not be applied to a town mutual company whose purpose—unlike privately owned companies—is to provide cooperative low-cost insurance to its members on a nonprofit basis. Sec. 612.-01(1)(a).

There is force to the respondent's contentions. Its arguments overlook, however, the fact that the policy in question is a contract of adhesion which was drafted and issued by it in full knowledge that Katze was exposed to risks to which the "ordinary farmer" may not be because of the nature of his farming operation. The policy expressly excludes six types of loss from coverage under the theft provision; theft by fraud is not one of them. As the court said in *Steinbach*, 237 N.W.2d at 783 "[a]n insurer, having affirmatively expressed coverage through broad promises, assumes a duty to define any limitations or exclusionary clauses in clear and explicit terms." [Citations omitted.] The respondent cites no authority in support of its contention that the rules of construction applicable to insurance policies generally should not be applied, or should be applied differently, to policies issued by a town mutual. We reject the contention.

It is undisputed that at all material times Laeske intended to appropriate Katze's cattle without paying for them. Katze was as fully deprived of the value of those cattle as if Laeske had spirited them away from the farm

---

[3] Section 612.31(4), Stats., prohibits town mutuals from transacting certain kinds of insurance business including "(j) credit insurance."

in the dead of night. That deprivation was not the result merely of an "unsuccessful credit transaction," but of a successful scheme to defraud Katze of his property. This scheme fits within the general meaning of the term "theft"; it does not fit within any of the exclusions of that term set forth in the policy. Construing the theft provision as we are required to do in favor of coverage and against the drafter, we conclude as a matter of law that it covered theft by fraud.

The respondent also contends that the loss is not covered because the cattle were not "farm personal property usual and incidental to the operations of a farm" within the meaning of the policy. The trial court found that Katze's role as a cattle-dealer was only remotely connected to his role as a farmer, and that nothing in the policy indicated that the livestock dealer part of his operations was intended to be covered. To the extent this determination was a finding of fact, it is against the great weight and clear preponderance of the evidence. To the extent it is a conclusion of law, we disagree with it.

The evidence is undisputed that *no* cattle were kept on Katze's farm which were not held for sale, and that all cows so held were utilized in his milking operation. It is undisputed that the respondent was fully apprised of the nature of Katze's operations at all material times. The policy expressly covers thirty cows, at a maximum $18,-000 value, as detailed in the schedule of farm personal property which is a part of the policy. It must therefore be presumed that up to thirty cows were intended by the parties to be covered against insured risks, regardless whether they were held for purposes of trade or for purposes of the dairy operation, or both.

It is further undisputed that more than thirty of the initial fifty cows were delivered to Laeske straight from the Katze farm, where they had been kept for an indefi-

nite time prior to the transfer, as opposed to other cows purchased by Katze from other farms and resold to Laeske after spending only an hour or so on the Katze farm being treated for shipping fever. It is finally undisputed that the respondent paid three or four prior claims to Katze for the value of cattle struck by lightning on his farm, and that it never previously contended that the cattle were not usual and incidental to the operation of that farm. We find no evidence in the record to support the trial court's conclusion that the thirty cows at issue in this action were not covered under this farmowner's policy.

The respondent concedes that the cows in question were covered, even though they were being held temporarily pending resale. It contends, however, that they were covered only while they were on the Katze farm. It contends that when the cows were delivered to Laeske with no consideration other than his promise to pay, they were no longer farm personal property usual and incidental to the operation of his farm. Acceptance of this argument would necessarily render the policy's theft provision meaningless. That provision insures against loss by theft. Theft is the reason the cattle were not on Katze's farm when he made his claim. We conclude that a loss occurred by way of a covered risk to property which, while on his farm, was usual and incidental to his farming operations.

Katze does not challenge on appeal the jury determination that coverage under the policy was limited to $18,-000—the value of the thirty cows listed in the schedule of covered property. The trial court's memorandum decision indicated its approval of that part of the jury's verdict. Judgment should therefore be granted against the respondent in that amount.

*By the Court.*—Judgment reversed and cause remanded with instructions to enter judgment against the respondent for $18,000. No costs to either party on appeal.