Harry KATZE, Plaintiff-Appellant,†

v.

RANDOLPH & SCOTT MUTUAL FIRE INSURANCE COMPANY,
a/k/a Randolph-Scott-Westford Insurance Company,
Defendant-Respondent-Petitioner.

Supreme Court

*No. 81–1073. Argued November 30, 1983.—*
*Decided January 4, 1984.*

(Also reported in 341 N.W.2d 689.)

† Motion for reconsideration denied February 15, 1984. CECI
and BABLITCH, WILLIAM A., JJ., took no part.

For the defendant-respondent-petitioner there was a brief by *Clyde C. Cross* and *Cross, Mercer and Maffei,* Baraboo, and oral argument by *Clyde C. Cross.*

For the plaintiff-appellant there was a brief by *John R. Miller* and *Miller & Miller,* Portage, and oral argument by *John R. Miller.*

Amicus curiae brief was filed by *Arnold P. Anderson* and *Carroll, Parroni, Postlewaite, Anderson & Graham, S.C.,* Eau Claire, for the Wisconsin Association of Town Mutual Insurance Companies.

STEINMETZ, J.   The issues in this case are whether the transaction of sale of cattle by an insured to a person purchasing them under a fraudulent scheme is a theft under this insurance policy and whether it is a direct loss of the cattle.

The plaintiff, Harry Katze, started suit in Columbia county circuit court, the Honorable Howard Latton, to recover under the theft provisions of defendant's, Randolph & Scott Mutual Fire Insurance Company, insurance policy.   The case was submitted to a jury which made findings favorable to the plaintiff on the insurance coverage issues.   On motions after verdict, the trial judge granted defendant's motions and judgment was entered dismissing plaintiff's complaint.   The court of appeals reversed and remanded the case for entry of judgment for $18,000 for the plaintiff.

Harry Katze is a farmer in Cambria, Wisconsin.   He is in the business of farming and buying and selling cattle.   All cattle located on his farm are brought there with the intention of being sold as part of the operation. How long he keeps a particular cow depends on market conditions; it may be part of a day or several months. In his farming operation, he keep an average of 30 cows on his farm and has an average turnover of 1,100 head of cattle a year.   While the cattle are on his farm, they are pastured in his fields, milked and housed in his barn, fed with crops raised in his fields and cared for by Katze and his son.

In late September, 1978, Philip Laeseke made arrangements with Katze to purchase 50 head of cattle.   All of these cattle were handled through Katze's farm and were owned by him when delivered.   Laeseke told Katze he would be paid when the cattle were delivered.   Six were delivered to a farm in Dane county, the rest were delivered to two farms in Juneau county.   When the final delivery of those 50 head was completed, Laeseke was not present.

The next day Laeseke called Katze and arranged to purchase additional cattle. Katze stated he would have to be paid for the cattle already delivered before any additional cattle were purchased. Laeseke paid by check for the 50 head already delivered and for the additional 22 cattle he was ordering. The 22 head were delivered to one of the two Juneau county farms. Another load of 12 head was subsequently delivered but those cattle were all recovered and are not a part of this lawsuit. After all the deliveries had been completed, Katze was notified by his bank that the check Laeseke had issued was an insufficient funds check (NSF). Katze recovered 21 head of cattle out of the total of 84 delivered.

It was subsequently determined that Laeseke had obtained the cattle with the sole design of defrauding Katze. His intent was to promptly sell the cattle and use the proceeds to pay off creditors who were "on his back in Dane County." Laeseke never intended to pay for any of the cattle. Laeseke was subsequently prosecuted for issuing a worthless check under sec. 943.24, Stats.[1]

---

[1] Sec. 943.24, Stats., provides:

"943.24 **Issue of worthless check.** (1) Whoever issues any check or other order for the payment of money less than $500 which, at the time of issuance, he or she intends shall not be paid is guilty of a Class A misdemeanor.

"(2) Whoever issues any single check or other order for the payment of $500 or more or whoever within a 15-day period issues more than one check or other order amounting in the aggregate to $500 or more which, at the time of issuance, the person intends shall not be paid is guilty of a Class E felony.

"(3) Any of the following is prima facie evidence that the person at the time he or she issued the check or other order for the payment of money, intended it should not be paid:

"(a) Proof that, at the time of issuance, the person did not have an account with the drawee; or

"(b) Proof that, at the time of issuance, the person did not have sufficient funds or credit with the drawee and that the person failed within 5 days after receiving notice of nonpayment or dishonor to pay the check or other order; or

The jury held the actions of Laeseke in obtaining the cattle constituted "theft" under the terms of the insurance policy. The trial court on motions after verdict ruled that the meaning of the policy as to theft coverage was an issue of law and that the facts of this fraudulent scheme did not constitute theft under the policy coverage. The court of appeals, in *Katze v. Randolph & Scott Mut. Fire Ins.*, 111 Wis. 2d 326, 330 N.W.2d 232 (Ct. App. 1983), disagreed and reversed.

In the policy, the dairy cows were valued at $600 a head and 30 cows were covered for a total exposure of $18,000, if the loss of the cows is covered under the policy.

The word "theft" is defined in the policy in paragraph 9 of the "Perils Insured Against" section as:

*"Theft,* meaning any act of stealing or attempt thereat and, as to Coverage C (on premises), including theft of property covered from within any bank, trust or safe deposit company, public warehouse or occupied dwelling not owned or occupied by or rented to an Insured, in which the property covered has been placed for safekeeping.

"Upon knowledge of loss under this peril or of an occurrence which may give rise to a claim for such loss, the insured shall give notice as soon as practicable to this Company or any of its authorized agents and also to the police.

*"General exclusions to theft:* This policy does not apply as respects this peril to loss (a) if committed by an Insured; (b) in or to a building, materials or supplies therefor; (c) by inventory shortages; (d) by wrongful conversion and embezzlement; (e) by escape; or (f) by mysterious disappearance."

"(c) Proof that, when presentment was made within a reasonable time, the person did not have sufficient funds or credit with the drawee and the person failed within 5 days after receiving notice of nonpayment or dishonor to pay the check or other order.

"(4) This section does not apply to a postdated check or to a check given for a past consideration, except a payroll check."

"Theft" generally is a broad term that includes a variety of wrongful acts aimed at depriving a person of his property. In this case, a fraudulent scheme was involved. The wrongful act by Laeseke was for the purpose of depriving Katze of his cows. Therefore, the policy provisions must be considered to determine the use of the word "theft." The company defined "theft" in the policy provisions broadly as "any act of stealing" and then set forth exclusions to the meaning of "theft." The exclusions from "theft" are acts:

(1) committed by an insured,

(2) in or to a building, materials or supplies, therefor,

(3) by inventory shortages,

(4) by wrongful conversion and embezzlement,

(5) by escape,

(6) by mysterious disappearance.

As the term "theft" is used in the policy, it has an ambiguous meaning. It is defined as any act of stealing; however, that does not eliminate ambiguity, but rather adds to it. This court has held theft to be coextensive in meaning with larceny. *Heinen v. Home Mut. Casualty Co.*, 5 Wis. 2d 282, 288, 92 N.W.2d 836 (1958). Some dictionaries hold stealing as a synonym of theft. With no further definition in the policy, "theft" is an ambiguous word.

The meaning of the word "theft" in the policy creates an issue of law for the court. In *Bauman v. Midland Union Ins. Co.*, 261 Wis. 449, 451, 53 N.W.2d 529 (1952), we held as follows: "The general rule is that the construction of words and clauses used in an insurance policy, where such construction does not depend upon extrinsic facts, presents a question of law for the court to decide, and is not for the jury." In *Bauman*, "No extrinsic evidence was offered as to what the parties

to the two insurance policies, upon which plaintiffs grounded their action, intended by use of the word 'explosion' . . . ." *Id.* at 452. Similarly, in the instant case no extrinsic evidence was offered as to the meaning of the word "theft" or "stealing" and as in *Bauman,* if such evidence were offered, it is doubtful whether it would have been admissible.

We have held consistently since *Bauman* that the construction of the words and clauses in an insurance policy is a question of law for the court. *Westerman v. Richardson,* 43 Wis. 2d 587, 591, 168 N.W.2d 851 (1969) ; *Rabinovitz v. Travelers Ins. Co.,* 11 Wis. 2d 545, 549, 105 N.W. 2d 807 (1960). For an early history of this rule, *see Thurston v. Burnett & Beaver Dam Farmers' Mutual Fire Ins. Co.,* 98 Wis. 476, 478, 74 N.W. 131 (1898) ; *Ganson v. Madigan,* 15 Wis. 158 (*144) (1862).

The court of appeals identified this insurance policy as a contract of adhesion. We disavow that categorization of the policy. This court has not labeled insurance policies as contracts of adhesion which have been defined as form contracts submitted on a "take it or leave it" basis. For a general discussion of adhesion contracts, *see* 6A Corbin on Contracts, sec. 1446 at 490 (1962) ; Ehrenzweig, *Adhesion Contracts in the Conflicts of Laws,* 53 Colum. L. Rev. 1072 (1953). Although adhesion contracts are generally standard form contracts, the two should be distinguished. Not all standard form contracts are contracts of adhesion, since in some cases the parties may add special clauses or alter the form. *See* Wilson, *Freedom of Contract and Adhesion Contracts,* 14 International and Comparative L. U. 172 (1965).

An adhesion contract is based on inequity of bargaining between two parties and greater use of the modern commercial contracts. A buyer may, in effect, have no

choice but to accept the contract if the organization offering the contract has little or no competition, or the buyer does not have an opportunity for comparative shopping. *See* Anderson, *Life Insurance Conditional Receipts and Judicial Intervention,* 63 Marq. L. Rev. 593, 602 (1980).

The rules of insurance policy interpretation have developed gradually and when necessary for law development. To sweep out in a single labeling of adhesion contract the well-established case law used in the interpretation of insurance contracts would not be of service to the public. We do not superimpose the case law of other jurisdictions regarding contracts of adhesion on this insurance policy. There are sufficient rules of interpretation of the policy and its meaning available.

Words or phrases in a contract are ambiguous when they are reasonably or fairly susceptible to more than one construction. *Garriguenc v. Love,* 67 Wis. 2d 130, 134–35, 226 N.W.2d 414 (1975) ; *Mutual Fed. S. & L. Asso. v. Wisconsin Wire Wks.,* 58 Wis. 2d 99, 205 N.W.2d 762 (1973) ; *Sipple v. Zimmerman,* 39 Wis. 2d 481, 159 N.W. 2d 706 (1968). There is no plain meaning to the word "theft" and further defining it as "any act of stealing" in the policy did not eliminate ambiguity.

The rule in resolving ambiguity in insurance contracts was stated in *Garriguenc,* 67 Wis. 2d at 134–35, as follows:

"In the case of an insurance contract, the words are to be construed in accordance with the principle that the test is not what the insurer intended the words to mean but what a reasonable person in the position of an insured would have understood the words to mean. Whatever ambiguity exists in a contract of insurance is resolved in favor of the insured." (Footnotes omitted.)

*See also McPhee v. American Motorists Ins. Co.,* 57 Wis. 2d 669, 205 N.W.2d 152 (1973).

It is reasonable to state that theft as used in the policy includes the act of taking property by fraudulent scheme as in the instant case, since theft generally is obtaining the property of another by an unlawful act. The insurance company wrote exclusions to "theft" in the policy to narrow the meaning of that term. When it enumerated in the policy what "theft" did not include, it risked not excluding all acts it meant to eliminate in the meaning of "theft." It did not exclude the act of fraudulent scheme as an act of theft.

It is argued that Katze's operation was really two-fold, his farm operation and buying and selling cattle. His application disclosed his cattle buying and selling business and the insurance agent was aware of this joint operation. The two businesses were intertwined, since the cattle while on the farm were pastured in his fields, milked and housed in his barn, fed with crops raised in his fields and cared for by plaintiff and his son. His involvement in buying cattle, milking, maintaining and caring for them on his farm and selling them was the nature of his entire operation and not separate and divisible enterprises. The cattle utilized by Katze in his farm operations were on his farm only temporarily, pending their sale through his livestock dealer operations. Thus, while on the farm, these cattle were the personal property that was usual and incidental to both his livestock dealer operation and his farm operation. The risk of loss under the policy was not altered since the average number of cattle subject to the policy risks was about the 30 covered by the policy.

Katze voluntarily and intentionally delivered the cattle to Laeseke with no reservations other than Laeseke's promise to pay for them. He put Laeseke in position to transfer good title of the cattle to any bona fide purchaser.

Even after Laeseke's check turned out to be an NSF check, Laeseke was still promising to get money from a bank to pay Katze for the cattle. Katze attempted to obtain the voluntary return of his cattle from Laeseke. He was able to obtain the voluntary return of only 21 head and filed a civil suit for the return of the remaining cattle and in the alternative, for damages. The remaining cattle had been sold before the check had been returned due to insufficient funds. A money judgment was obtained and through garnishment the sum of $16,-200 was obtained from Laeseke.

The insurance policy insures "against direct loss to the property covered." The direct loss which Katze sustained was not of the cattle that he sold and delivered to Laeseke, but rather of the money that Laeseke had promised to pay him for the cattle. To hold otherwise would in effect hold that the policy insures the consideration in business transactions or that Katze was insured against a lack of prudence in making a bad bargain. It is not reasonable nor would a reasonable insured contemplate that the theft coverage provided by this farmowner's policy extended to the very substantial credit and business loss risks so obviously inherent in Katze's $800,000 per year livestock dealer operations.

A reasonable insured would not have assumed that the policy covered unsuccessful credit transactions in the cattle dealer business. Katze surrendered physical possession of the cattle to Laeseke in the sale on credit, since he was not given any payment on delivery of the first 50 head. Katze could have refused delivery until he had been paid. Instead he relied on payment subsequent to delivery and therefore extended credit even though it was for a short duration. Theft took place due to Laeseke's fraudulent intent under the wording of the policy; however, what Laeseke directly stole from Katze was the

sale value of the cattle. Laeseke directly stole money due Katze for the cattle. We find the reasonable analysis is that the money not received for the unrecovered cattle was his direct loss. Katze surrendered the cattle in exchange for the commercial paper, the NSF check, and therefore the direct loss he sustained was the money represented by the check and not the cattle. But for the bad commercial deal occasioned by Laeseke's fraud, Katze had no intention of maintaining or retaining any proprietary interest in the cattle. Katze transferred the cattle to Laeseke and expected money in return so that his direct loss in the transaction was money.

We therefore hold the fraudulent transfer was a theft under the ambiguous terms of the insurance policy; however, the direct loss to the farmer, Katze, was money, not cattle, as a result of a poor commercial transaction.

*By the Court.*—The decision of the court of appeals is reversed.

SHIRLEY S. ABRAHAMSON, J. (dissenting). I find the reasoning of the opinion of the court of appeals persuasive, and I would affirm the decision of the court of appeals. *Katze v. Randolph & Scott Mut. Fire Ins.,* 111 Wis. 2d 326, 330 N.W.2d 232 (Ct. App. 1983).