**Patrick CARRICK, Plaintiff,**

v.

**AQUENT, INC., Defendant.**

No. 03–C–0924.

United States District Court, E.D. Wisconsin.

Dec. 2, 2003.

Benjamin J. Harris, Paul A. Piaskoski, Piaskoski & Associates, Milwaukee, WI, for Plaintiff.

Daniel W. Tarpey, Michael D. Wexler, Seyfarth Shaw, Chicago, IL, Jeffrey O. Davis, Quarles & Brady, Milwaukee, WI, for Defendant.

## DECISION AND ORDER

CALLAHAN, United States Magistrate Judge.

On August 22, 2003, the plaintiff, Patrick Carrick ("Carrick"), filed a complaint in the Milwaukee County Circuit Court, naming Aquent, Inc. ("Aquent") as the defendant. In his complaint Carrick sets forth a claim for declaratory judgment. Specifically, he seeks an order and judgment declaring that the "Restrictive Covenant" (the "Agreement") which he signed on November 30, 2000, including its arbitration provision, is invalid and unenforceable.

On September 22, 2003, the complaint was removed by Aquent to the United States District Court for the Eastern District of Wisconsin on the basis of diversity jurisdiction. Specifically, in the removal papers, Aquent asserts that Carrick is an Illinois resident, that Aquent is a Delaware corporation with its principal place of business in Boston, Massachusetts, and that the matter in controversy exceeds the sum of $75,000.00.

Along with the removal papers, Aquent filed a motion to dismiss pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure. Aquent's motion to dismiss is predicated on the claim that the Agreement includes an arbitration provision. Such being the case, the Federal Arbitration Act, 9 U.S.C. § 1, *et seq.* ("FAA"), requires that the court dismiss the case and allow the parties' dispute to proceed to arbitration in accordance with the terms of the Agreement.

The FAA provides that courts shall enter a stay pending arbitration when issues brought before the courts are subject to arbitration clauses. 9 U.S.C. § 3. Courts have interpreted that provision, however, to permit dismissal if all issues raised in an action are arbitrable and must be submitted to arbitration. *See Sagal v. First USA Bank*, 69 F.Supp.2d 627, 632 (D.Del.1999), and cases cited therein; *see also Choice Hotels International, Inc. v. BSR Tropicana Resort, Inc.*, 252 F.3d 707, 709–10 (4th Cir.2001) ("Notwithstanding the terms of § 3, however, dismissal is a proper remedy when all of the issues presented in a lawsuit are arbitrable."); *Hostmark Investors Ltd. v. Geac Enterprise Solutions, Inc.*, 2002 WL 1732360, at * 3 (N.D.Ill.) (quoting *Alford v. Dean Witter Reynolds, Inc.*, 975 F.2d 1161, 1164 (5th Cir.1992)) ("Although the Seventh Circuit does not appear to have addressed the issue, '[t]he weight of authority clearly supports dismissal of the case when all of the issues raised in the district court must be submitted to arbitration.' "). Aquent argues that this is just such a case and that therefore Carrick's complaint and this action should be dismissed.

Carrick filed a brief in opposition to the defendant's motion to dismiss. At the same time, he filed a motion for preliminary injunction "prohibiting Aquent from proceeding with the arbitration until this Court determines whether Aquent's agreement is unconscionable in whole or in part." (Pl.'s Mot. at [unpaginated] 1.)

Finally, Aquent filed a reply brief in support of its motion to dismiss. At the same time, Aquent filed a motion "for an enlargement of time in which to respond to Plaintiff's Motion for Preliminary Injunction from November 8, 2003, until ten days after this court rules on Aquent's Motion to Dismiss." (Def.'s Mot. for Enlargement of Time and Mem. in Supp. Thereof ["Def.'s Mot. Enl. Time"] at 1.) Aquent argues that "[b]ecause a decision on Aquent's motion, which is now fully briefed, may be dispositive of Plaintiff's action in its entirety, ... it would be a waste of the parties['] resources to spend the time and money required to continue litigating the merits of this action in this court, while Aquent's dispositive Motion to Dismiss remains pending." (Def.'s Mot. Enl. Time at 1.)

In his brief in opposition to the defendant's motion to dismiss (and in support of his motion for preliminary injunction) Carrick asserts that the circumstances giving rise to his signing the Agreement (and this lawsuit) are as follows:

In the Fall of 2000 Renaissance Worldwide, Inc. (RWI), an information technology consulting business, approached Carrick in Milwaukee, WI with a job opportunity as an account manager to sell RWI's services to businesses in the Chicago, IL area. Carrick was born and raised in Milwaukee, and he lived and worked in the Milwaukee area at that time. After meeting with RWI personnel, Carrick asked RWI to put its job offer in writing; and several days later, in mid-October 2000, Carrick received a letter from RWI, in Milwaukee, confirming the terms and conditions of his proposed employment. RWI did not tell Carrick that he would be required to sign the Restrictive Covenant underly-

ing this action or to arbitrate employment disputes in Massachusetts. Following his receipt of RWI's written job offer, Carrick verified his starting date of November 13, 2000 and then terminated his sales job with his Milwaukee employer. He also gave notice to his landlord terminating his townhouse tenancy and made arrangements for temporary housing in Fox Lake, Illinois. Carrick began searching for a permanent residence in Illinois, entered into a binding contract to purchase a home in Wauconda, IL, and paid $3000 in earnest money to the seller on November 5, 2000. When Carrick reported for his first day of work at RWI, in Chicago, on November 13, 2000, the branch manager of RWI gave him the Restrictive Covenant and told him that he had to sign it or he wouldn't be working there. Carrick asked the branch manager what the agreement really meant, and the branch manager stated that if he ever left RWI, he could not call on any accounts that he had directly serviced while working there. With that explanation, and because Carrick had already given up his job in Milwaukee, moved to Illinois, and committed to purchase a home there, he signed the Restrictive Covenant.

In December 2001, according to Securities and Exchange Commission (SEC) records, JetElectro Acquisition Corp., RWI and Aquent, Inc. (Aquent) concluded a merger plan whereby JetElectro merged with and into RWI, with RWI being the surviving corporation and a subsidiary of Aquent.

In March 2003 Carrick left Aquent's employ to return to Milwaukee and take a job with Ajilon, Inc., an IT consulting business, where he replaced a departing employee responsible for servicing two of Ajilon's largest and longstanding accounts. One of these accounts is Northwestern Mutual Like Insurance Company (NML), a well known Milwaukee-based company. Aquent's Milwaukee office, but not its Chicago office, also does business with NML. Although Carrick never called on or serviced NML while he was employed by RWI or Aquent, Aquent contends that Carrick is violating the Restrictive Covenant by his contacts and relationship with NML in Milwaukee.

On or about August 1, 2003, Aquent demanded arbitration of this claim with the American Arbitration Association (AAA) in Boston, Massachusetts, asserting that RWI had assigned the Restrictive Covenant to Aquent in connection with the merger described above.

Carrick objected to Aquent's demand for arbitration in Boston, Massachusetts on the grounds that the Restrictive Covenant is a contract of adhesion, unconscionable, invalid and unenforceable in Wisconsin. Carrick contends that the Restrictive Covenant is contrary to the public policy embodied in Wis. Stat. § 103.465, and that the attempt to arbitrate this dispute in Boston, Massachusetts is improper when Carrick, NML and all necessary witnesses work or reside in, or within a short distance of Milwaukee. No further action has been taken in the arbitration, except that the AAA decided on September 22, 2003 that the arbitration would proceed over Carrick's objections "in the absence of an agreement by the parties or a court order staying this matter."

(Pl.'s Br. at 2–4 (footnote and citation omitted).)

At the heart of both the plaintiff's declaratory judgment claim in this lawsuit and the defendant's motion to dismiss is the Restrictive Covenant, i.e., the Agreement, which was signed by the plaintiff on November 30, 2000. The text of that document reads as follows:

## NON DISCLOSURE, NON SOLICITATION AND NON COMPETITION AGREEMENT

During the course of my employment with Renaissance Worldwide, Inc. and/or its subsidiaries and affiliates (the "Company") I realize that I may have access to confidential and/or proprietary information belonging either to the Company or its customers, clients, business partners, employees or independent contractors. Such information may be related to these parties' respective services and products, customers' business methods, strategies and practices, internal operations, pricing and billing, financial data, costs, personnel information (including but not limited to names, educational background, prior experiences and availability), customer and supplier concerns and needs, sales lists, technology, software, computer programs, other documentation, computer systems, inventions, developments, trade secrets of every kind and character, information designated by any of these parties as being proprietary or confidential, and all other information that might reasonably be deemed confidential ("Confidential Information").

Furthermore, I acknowledge that I may create or develop additional Confidential Information in the course of performing my job duties for the Company.

Therefore, in consideration of my employment by the Company and the salary, bonuses, commissions and any stock options I may be granted, I agree:

1. That I will not at any time during my employment with the Company or thereafter for myself or for any other company or entity, divulge the name or address or any other information concerning my Company accounts, clients, customers, business patrons, or technical, temporary or staff personnel.

2. That, upon termination of my employment for any reason, I will deliver to the Company all Confidential Information, records, notes and memoranda of any nature, in my possession or control, which are the property of the Company or which relate to my employment or to the Company's business activities.

3. That, during the term of my employment and for one (1) year thereafter, I will not in any way, directly or indirectly, solicit, divert, take away or attempt to solicit, divert or take away any staff, technical, or temporary personnel, trade, business or goodwill from the Company nor will I otherwise compete or attempt to compete for said accounts or personnel which I serviced and/or became known to me through my employment with the Company, and I agree not to influence or attempt to influence any of the Company's customers or technical and temporary not to do business with the Company. It is agreed and understood that the period of restriction set forth in this paragraph will be tolled, and will not run, during any period of time in which I am in violation of the terms hereof.

4. To disclose fully and promptly to the Company any and all inventions, processes, designs, innovations, discoveries, developments, techniques, formulae, improvements, computer programs and copyrightable materials relating to the Company's business which I shall discover, conceive, make, separate, or reduce to practice, alone or jointly with others, during my employment and resulting from such employment, whether or not patentable or copyrightable; to assign to the Company all my right title and interest in and to such inventions, etc., including copyrights to all copyrighta-

ble material and patent rights to all patentable material, except for those inventions, etc. specifically excluded by applicable state or federal law. I agree to execute at any place, at the Company's request and expense, any applications, assignments, [indecipherable], affidavits, or other documents needed to confirm or perfect the Company's ownership rights hereunder.

5. I understand that this Agreement is necessary for the Company to preserve its legitimate rights in its Confidential Information and in inventions, discoveries, etc. related to its business interests or which result from Company-sponsored research or use of Company resources. I understand that it is not the Company's intent to deprive me of any rights in any inventions to which I may otherwise be entitled by law.

6. I recognize and agree that the Company's remedy at law for any breach of the provisions of this Agreement would be inadequate, and I agree that for breach of such provisions, the Company shall, in addition to such other remedies as may be available to it at law or in equity or as provided in the Agreement, be entitled to injunctive relief and to enforce its rights by an action for specific performance. Should I engage in any activities prohibited by this Agreement, I agree to pay over to the Company all compensation, remuneration or monies or property of any sort received in connection with such activities and to pay all reasonable attorney's fees of the Company incurred in connection with the enforcement of its rights hereunder; but such payments, however, shall not impair or preclude any other rights or remedies of the Company or my obligations or liabilities under this Agreement or applicable laws.

7. Any claim or controversy arising out of or relating to this Agreement, including (without limitation) a claim by the Company that I have violated any one or more of the restrictions set forth in this Agreement, shall be resolved by arbitration before a single arbitrator (who shall be a lawyer) in Boston, Massachusetts, in accordance with the Commercial Arbitration Rules of the American Arbitration Association. If the arbitrator finds that a violation of the foregoing restrictions exists or is threatened, he shall prescribe appropriate relief which may include an award of the nature described in Section 6 and an order that I desist from such violations, whether or not such an order would issue in the circumstances, under the equity powers of a court. Judgment upon the award rendered by the arbitrator shall be entered in any court competent of jurisdiction.

8. This Agreement shall inure to the benefit of the Company and its successors, and shall be binding upon by assigns, executors, administrators and other legal representatives. This Agreement does not constitute a contract of employment and does not imply that my employment will continue for any period of time. If any part of any term or provision of this Agreement shall be held or deemed to be invalid or unenforceable to any extent by a court of competent jurisdiction: (i) such term or provision shall nonetheless be enforced to the extent it is adjudged to be reasonable, and (ii) such circumstances shall in no way affect any other term of provision of this Agreement or the enforceability or validity of this Agreement.

9. This Agreement contains the entire agreement between the Company and me with respect to the subject matter

hereof, and there have been no oral or other prior agreements of any kind whatsoever as a condition, precedent or inducement to the signing of the Agreement or otherwise concerning this Agreement or the subject matter thereof.

10. This Agreement shall be governed by, construed and enforced in accordance with the laws of the Commonwealth of Massachusetts, without regard to conflict of law principals.

(Def.'s Notice of Removal, Ex. A.)

Carrick asserts that the "NON DISCLOSURE, NON SOLICITATION AND NON COMPETITION AGREEMENT", i.e., the Agreement, is both "procedurally and substantively unconscionable under Wisconsin law." (Pl.'s Br. at 8.)

Procedural unconscionability is determined from factors bearing on a meeting of the minds, such as experience, relative bargaining power, who drafted the contract, whether the terms were explained to the weaker party, and whether alterations in the printed terms were possible. Substantive unconscionability relates to the "reasonableness of the contract terms themselves." *See Discount Fabric House,* 117 Wis.2d at 601, 345 N.W.2d at 424 and *Leasefirst v. Hartford Rexall Drugs, Inc.,* 168 Wis.2d 83, 89–90, 483 N.W.2d 585 (Wis.App. 1992).

(Pl.'s Br. at 10.) According to Carrick, the Agreement is procedurally unconscionable because "Carrick received an offer of employment while he was living and working in Wisconsin. He was not given the restrictive covenant or arbitration provisions before he accepted the offer, quit his job, gave up his townhouse, moved to Illinois and purchased a new home there." (Pl.'s Br. at 9.) And according to Carrick, the Agreement is substantively unconscionable because "[t]he terms of the contract ... include an unreasonably broad restrictive

covenant, mandatory arbitration in Massachusetts, forfeiture of all compensation, and payment of RWI's attorney's fees." (Pl.'s Br. at 9.) Because of the foregoing, Carrick argues that the Agreement, including its arbitration provision, is unenforceable. He asks that the court, first of all, find the arbitration provision to be unenforceable. He then asks that the court find the remaining provisions of the Agreement to be unenforceable.

Aquent responds by arguing that "there is a clear and unambiguous intent to arbitrate in the agreement at issue." (Def.'s Reply Br. at 5.) "[T]he sole issue for the court to decide is whether this matter is to be arbitrated pursuant to the FAA. This court's inquiry does not extend to the litany of issues Carrick is attempting to raise in his effort to make an end run around the FAA and the controlling authority in this Circuit." (Def.'s Reply Br. at 3.)

The Seventh Circuit Court of Appeals clearly stated in *We Care Hair Development, Inc. v. Engen,* 180 F.3d 838 (7th Cir.1999), that "in analyzing a motion to compel arbitration, the court must only consider issues relating to 'the making of the agreement for arbitration or the failure to comply therewith.' 9 U.S.C. § 4. Once the court determines that an arbitration clause is enforceable, the status of the other contract terms is for the arbitrator to decide." 180 F.3d at 844 (*citing Prima Paint v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 403–04, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967)). Thus, the first, and potentially only, question that this court must address is whether the arbitration clause in the Agreement is valid and enforceable.

■ That there is an arbitration provision in the Agreement is clear. Under the FAA, arbitration clauses "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9

U.S.C. § 2. Indeed, "[s]tate contract defenses may be applied to invalidate arbitration clauses if those defenses apply to contracts generally." *We Care Hair*, 180 F.3d at 842–843 (*citing Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 687, 116 S.Ct. 1652, 134 L.Ed.2d 902 (1996)).

■ Carrick's argument is that, because he had already given up his job and residence in Wisconsin by the time the Agreement had been presented to him, he was for all intents and purposes compelled to sign the Agreement. In other words, at the time that he was presented the Agreement to sign, he was in some degree of economic peril. This translated into economic duress of such magnitude that it deprived him of his free will, thereby rendering the Agreement, including its arbitration provision, unenforceable.

Furthermore, Carrick argues that "[u]nder Wisconsin law, a contract of adhesion exists where a disadvantaged party has no realistic opportunity to bargain over its terms, and thus has little choice but to accept the contract. Similarly, unconscionability in Wisconsin is recognized where there is an absence of meaningful choice on the part of one party, together with contract terms that are unreasonably favorable to the other party." (Pl.'s Br. at 9 (citation omitted).) For this additional reason, Carrick argues that the court should find the Agreement unenforceable.

■ To be sure, "[a]n arbitration clause will not be enforced if it resulted from 'the sort of ... overwhelming economic power that would provide grounds for the revocation of any contract.' " *S+L+H S.p.A. v. Miller–St. Nazianz, Inc.*, 988 F.2d 1518, 1528 (7th Cir.1993) (omission in original) (*quoting Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 627, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985)). Indeed, in *Miller–St. Nazianz*, the court applied Wisconsin law to the facts in that case. In doing so, the court stated the following:

> To make a claim of economic duress under Wisconsin law, Miller must allege facts that demonstrate that "a wrongful or unlawful act or threat" by SLH deprived Miller of its "unfettered free will" and forced it to accept the arbitration clause in the 1989 Agreement. *Pope v. Ziegler*, 127 Wis.2d 56, 377 N.W.2d 201, 203 (Wis.Ct.App.1985). Moreover,
>
> > "[a]s a direct result of these elements, the party threatened must be compelled to make a disproportionate exchange of values or to give up something for nothing. If the payment or exchange is made with the hope of obtaining gain, there is not duress; it must be solely for the purpose of protecting the victim's business or property interests.... A threat to do what the person making the threat has the legal right to do does not constitute duress; nor does driving a hard bargain or taking advantage of another's financial difficulty."

*Miller–St. Nazianz*, 988 F.2d at 1528 (footnoted omitted) (*quoting Wurtz v. Fleischman*, 97 Wis.2d 100, 293 N.W.2d 155, 158, 160 (1980)). In my opinion, the circumstances surrounding Carrick's being required to sign the Agreement were not such as to render the Agreement unenforceable because of economic duress.

To be sure, at least according to the assertions set forth in Carrick's brief, Carrick moved out of his rented townhouse in Wisconsin so that he might move to Illinois to start his new job. (Pl.'s Br. at 2.) Three days prior to starting his new job, he put a $3,000 down payment on a new home he contracted to purchase in Illinois. (Pl.'s Br. at 2.) This set of circumstances undoubtedly would have made it somewhat difficult for him to refuse to sign the Agreement and walk away from the job.

However, it hardly presents a picture of a person who was so desperate that he was deprived of his unfettered free will.

Furthermore, that representatives would present him with a non compete agreement is not the sort of act that would rise to the level of being a wrongful or unlawful threat. To the contrary, newly-hired employees who may have access to proprietary information are quite often asked to sign such agreements in connection with commencement of their employment.

Finally, in return (at least in part) for his signing the Agreement, Carrick was being provided an employment opportunity which was (presumably) an attractive opportunity. If it were not an attractive opportunity, Carrick would certainly not have given up his previous job. Such being the case, this is not a situation where, in signing the Agreement, Carrick was giving up "something for nothing" and was doing so "solely for the purpose of protecting [his] business or property interests." *Pope*, 127 Wis.2d at 60, 377 N.W.2d at 203.

Simply stated, the circumstances presented by the plaintiff in support of his claim that his signature on the Agreement was obtained as a result of duress are insufficient to thwart the defendant's motion to dismiss, which motion is predicated on the efficacy of the Agreement's arbitration provision.

■■■■ Carrick also argues that the Agreement (including its arbitration provision) is a contract of adhesion and is therefore unenforceable. An adhesion contract is "[a] standard-form contract prepared by one party, to be signed by the party in a weaker position, [usually] a consumer, who has little choice about the terms." *Black's Law Dictionary* 318–319 (7th ed.1999). A "contract of adhesion is generally found under circumstances in which a party has, in effect, no choice to accept the contract offered, often where the buyer does not have the opportunity to do comparative shopping or the organization offering the contract has little or no competition." *Deminsky v. Arlington Plastics Mach.*, 259 Wis.2d 587, 612, 657 N.W.2d 411, 423 (2003) (*citing Katze v. Randolph & Scott Mut. Fire Ins. Co.*, 116 Wis.2d 206, 212–13, 341 N.W.2d 689 (1984)). The rule of contracts of adhesion, however, only goes to interpretation of the contract. *Clark Oil & Refining Corp. v. Leistikow*, 69 Wis.2d 226, 239, 230 N.W.2d 736, 744 (1975). Thus, even assuming that a contract is one of adhesion, that does not automatically mean that the contract is unenforceable.

That having been said, the Agreement in this case cannot be said to be a contract of adhesion. Carrick avers in his complaint that "RWI drafted the Restrictive Covenant, required most new employees in the Chicago area to sign the Agreement, and did not permit any modification to the Agreement. RWI presented the Restrictive Covenant to Carrick as a 'take it or leave it' prerequisite to employment during Carrick's first day of work." (Compl. at ¶ 8.) However, Carrick did have a choice to accept or reject the proffered Agreement. To be sure, a rejection may have deprived him of the opportunity to work with RWI. But Carrick does not allege or argue that he could not have sought employment elsewhere, as emotionally taxing as that might have been for him.

In this regard, Carrick's situation is not akin to that of a consumer, such as the plaintiff in *Discount Fabric House of Racine, Inc. v. Wisconsin Telephone Company*, 117 Wis.2d 587, 345 N.W.2d 417 (1984). In that case, the plaintiff company was truly forced to accept the contract offered by the defendant (which contract contained an exculpatory clause), as the defendant was the only entity from whom yellow page advertising displays could be purchased. By contrast, and for the reasons

stated above, Carrick did have an option, i.e., he could have sought work elsewhere.

In the end, I am not insensitive to the emotional and financial burden the plaintiff may need to shoulder in having this dispute arbitrated in Boston, Massachusetts. However, I am persuaded that the arbitration clause in the Agreement is enforceable. Furthermore, it is clear that the underlying dispute is arbitrable as it involves a claimed violation of the terms of the Agreement by Carrick. Having found the arbitration clause to be enforceable, "the status of the other contract terms is for the arbitrator to decide." *We Care Hair*, 180 F.3d at 844. This of course would include deciding whether the substantive terms of the Agreement are valid and enforceable or instead are, as argued by Carrick, unconscionable and therefore unenforceable.

**NOW THEREFORE IT IS ORDERED** that the defendant's motion to dismiss be and hereby is **GRANTED**;

**IT IS FURTHER ORDERED** that the plaintiff's motion for preliminary injunction be and hereby is **DENIED AS MOOT**;

**IT IS FURTHER ORDERED** that the defendant's motion for enlargement of time be and hereby is **DENIED AS MOOT**;

**IT IS FURTHER ORDERED** that this action be and hereby is **DISMISSED**;

**IT IS FURTHER ORDERED** that the Clerk of Court enter judgment accordingly.