Gordon CHALK, John Craig, Leann Craig, Lawrence Crown, Carol Devine, Michael Duesing, William Eckert, Beatrice Eckert, Wayne Ehrhard, Howard Harms, Richard Houk, Janet Houk, George Isch, Dale Kylmanen, Maureen Kylmanen, Erik Leadholm, Gary Lindauer, Donna Lindauer, Doris Lundgren, John Lundgren, Thomas Lundgren, Sharon Lundgren, Gordon Manning, Linda Manning, Rose Mattison, Carolyn Miller, Robert Petruska, Steven Rickard, Marvin Ross, Anne Rowland, Cyril Rueth, Adeline Rueth, Thomas Schleitwiler, Paul Shore, Alice Shore, Joyce Sweet, John Tappen, James Thiel, Geoffrey Tullett, Kathryn Vonderau, Albert Wainwright, Lyle Wallace, Rebecca Wallace, David Whaley, James Williams, Michael Williams, Gerald Gruszynski, Donna Gruszynski, and Trilok Khanna, Plaintiffs-Appellants,

v.

TRANS POWER MANUFACTURING, INC., Free-Wing Turbine Corporation, Harry Winderman, P.A., Financial Strategies, Inc., Virchow, Krause & Company, Benjamin V. Helsten, Jr., Laird B. Gogins, Harry Winderman, Gary S. Babler, Robert B. Roemer, Defendants,

Alan Edward CLARE, Defendant-Respondent. †

Court of Appeals

*No. 88-2276. Submitted on briefs November 10, 1989.—Decided December 7, 1989.*

† Petition to review pending. This petition was not disposed of at the time the volume went to press. Its disposition will be reported in a later volume.

621

(Also reported in 451 N.W.2d 770.)

For the plaintiffs-appellants the cause was submitted on the briefs of *Timothy J. Casper* of *Coyne, Niess & Becker* of Madison.

For the defendant-respondent the cause was submitted on the brief of *John A. Hansen* and *Edwin J. Hughes* of *Stafford, Rosenbaum, Rieser & Hansen* of Madison.

Before Eich, C.J., Gartzke, P.J., and Dykman, J.

EICH, C.J.   Gordon Chalk and forty-eight other plaintiffs (collectively, "Chalk") appeal from a summary judgment dismissing their action against Alan Edward Clare, an insurance underwriter for Lloyd's of London. Lloyd's had provided a policy to Harry Winderman, a Florida attorney against whom Chalk had obtained judgment in a legal malpractice action.

The primary issue is one of coverage—specifically, whether a "claim"—as that term is defined in the Lloyd's policy—was made against Winderman so as to invoke the policy's coverage provisions.[1] Chalk also contends that the trial court erred in awarding Lloyd's, as the prevailing party, statutory costs against each of the forty-nine plaintiffs. We conclude that there was no claim and thus no coverage under the policy. We also conclude that the trial court properly assessed costs against all plaintiffs.[2]

In summary judgment cases we employ a "methodology" identical to that applicable in the trial court. We have often discussed the procedures and need not repeat

---

[1]The Lloyd's policy is a "claims made" policy because it insures Winderman for any negligent acts as an attorney, including those occurring prior to the policy's effective date, as long as the claim is made during the policy period. In this sense, "claims made" coverage differs from "occurrence" malpractice coverage which, like similar coverage in automobile and general liability policies, provides insurance for acts occurring during the policy period, even though the claim may not be asserted until long after the policy had expired.

[2]Chalk also argues that the court erred by not ruling as a matter of law that, despite lack of the required notice of the claim, Lloyd's was not prejudiced thereby and thus the failure to notify should be ignored. Because we agree with the trial court that no claim had been made against Winderman within the meaning of the policy, we need not address the issue.

them here. *See Grams v. Boss,* 97 Wis. 2d 332, 338–39, 294 N.W.2d 473, 476–77 (1980). Generally, summary judgment avoids the necessity of a trial in cases where the material facts are not in dispute and only a question of law is presented. *Bulgrin v. Madison Gas & Electric Co.,* 125 Wis. 2d 405, 407–08, 373 N.W.2d 47, 49 (Ct. App. 1985). That is the situation here; there is no dispute of material fact and the briefs raise only legal issues.

Winderman, an attorney specializing in securities work, prepared a prospectus and performed other legal services in connection with the Wind Energy Program, an enterprise involved in the purchase and installation of energy-producing windmills in the western United States. Under the program, each windmill—costing between $240,000 and $330,000—would be purchased by a limited partnership for installation in California or Utah. Chalk and the other plaintiffs held fractional interests in various limited partnerships formed in Wisconsin for this purpose in the early 1980's.

No windmills were ever built or installed, and the plaintiffs sued everyone involved in the windmill scheme, including Winderman. The case went to trial and, among other things, Winderman was found to have been negligent in the provision of legal services to the enterprise and judgment was entered against him in the approximate sum of $1,251,000.

Winderman's malpractice policy with Lloyd's covered all sums he became liable to pay "as a result of CLAIMS FIRST MADE AGAINST THE INSURED DURING THE POLICY PERIOD . . .. by reason of any . . . error or omission in professional services rendered . . .." (Emphasis in the original.) The policy defined "claim" as "a demand received by the insured for money or services, including the service of suit or institution of arbitration proceedings against the Insured."

Chalk relies on two governmental inquiries into Winderman's association with the Wind Energy Program during the policy period as establishing that a "claim" was made against him within the meaning of the policy. The first was a communication by an attorney from the office of the Wisconsin Securities Commissioner who contacted Winderman with respect to an investigation of the Wind Energy Program. The attorney, Stephen Mueller, submitted an affidavit in the trial court proceedings stating that he had contacted Winderman concerning the Program's application for exemption from the state's securities registration requirements. Mueller continues: "I demanded that Winderman provide services to further the investigation by searching his records to determine if he could document what he had communicated to [a person named "Babler" who is otherwise unidentified in the affidavit] regarding his attempt to qualify offers and sales in the Wind Energy Program under the Wisconsin Securities Act."

The second inquiry was a letter to Winderman from an Internal Revenue Service attorney outlining an agreement apparently reached with Winderman in an earlier telephone conversation whereby Winderman would provide the IRS with "copies of the information in [his] file relative to the Wind Energy . . . Program." The letter advised that the IRS was "only conducting an examination at this point and that no conclusions have been reached in your case relative to your exposure under IRC 6700 and 7408."

Neither inquiry resulted in any charges or proceedings against Winderman in connection with his representation of, or involvement with, the Wind Energy Program.

Emphasizing the language of Mueller's affidavit that so closely tracks the language of the Lloyd's pol-

icy—"I demanded that Winderman provide services"—Chalk asserts that because Mueller unequivocally stated that he made a demand for services on Winderman, a claim was made on him under the plain meaning of the terms of the policy. He also refers us to dictionary definitions of "demand" equating the term with a simple "question" or "inquiry," and of "services" as "performance of labor for the benefit of another." He states: "Clearly Winderman was asked to perform labor for both [agencies] . . .. He was asked to review his files, analyze them, and send forth appropriate documentation."

Unlike Chalk, we are not impressed with Mueller's unusual choice of words. We are aware that it is common practice for attorneys to draft affidavits for witnesses' signatures and just as we believe it was no coincidence that Mueller's affidavit parroted the policy language, we also believe it was no coincidence that Chalk's attorney's signature appears as a notary public at the end of the affidavit. In addition, the issue in this case is whether a claim—a demand for services—was made on Winderman within the meaning of the policy. And the fact that a witness—or one of the parties' attorneys—says that it was does not make it so.

More to the point, Chalk asserts that, while no Wisconsin cases appear to have addressed the issue, courts in other jurisdictions "have held that similar demands by governmental agencies are claims under claims made policies." We have considered each of the three cases cited by Chalk in support of the proposition and we are not persuaded.

The first, *Walker v. Larson,* 727 P.2d 1321 (Mont. 1986), concerned an attorney (Larson) who had apparently filed erroneous tax returns for an estate he was retained to probate. An IRS agent contacted Walker, the

personal representative of the estate and the person who had retained Larson, pointing out the error and informing Walker that, as a result, the estate owed considerable sums in unpaid taxes and interest. Walker complained to the state lawyer competency board. The complaint detailed Larson's alleged malpractice, and a copy was forwarded to him. Walker also contacted Larson's malpractice insurer's general agent to complain about Larson's handling of the estate. Eventually, Walker sued Larson for malpractice and the insurer denied coverage on grounds that no formal claim had been made within the policy period.

Because Larson's policy nowhere defined the term "claim," the court held that it was ambiguous and, construing it strictly against the insurer, ruled that the complaint to the lawyer competency board and Walker's direct complaints to the insurer were sufficient to constitute a "claim" and directed that judgment be entered in Walker's favor. *Walker,* 727 P.2d at 1323. Unlike the situation in *Walker,* the Lloyd's policy specifically defines the term "claim," and we see no ambiguity in the policy language. In addition, the party injured by the attorney's malpractice in *Walker* not only complained about his conduct to the state lawyer competency agency but also to the insurer itself, and the court held this was adequate, given the fact that the term "claim" was not defined under the policy. No such complaints were made in this case.

Chalk next cites *Mt. Hawley Ins. v. Federal Sav. & Loan Ins. Corp.,* 695 F. Supp. 469 (C.D. Cal. 1987), a case we find similarly unavailing. *Mt. Hawley* involved a claims made policy which, like the policy in *Walker,* did not define the term "claim." As a result, the court looked to general definitions of the term in California law—notably that a claim "imports the assertion,

demand or challenge of something as a right; the asser-
tion of liability to the party making it to do some service
or pay a sum of money . . .." *Id.* at 479. The "demand"
in *Mt. Hawley* was indeed a demand alleging specific acts
of misconduct on the bank's part and requiring correc-
tive action. It was not simply a request to provide infor-
mation from a file, as is the case here. Indeed, the *Mt.
Hawley* court emphasized that a "request for an explana-
tion" is *not* a claim within the meaning of a claims made
policy.[3] *Id.*

[3]We believe *Mt. Hawley* is distinguishable on its facts as well.
The policy at issue in that case insured a bank which had been
ordered closed by a federal agency, the Federal Home Loan Bank
Board. The events giving rise to the argument that a claim had
been made against the bank included three notices to the bank
from the FHLBB, two warning the bank that failure to comply
with various operating restrictions imposed by the board for the
bank's violation of the regulations and conditions of its federal
insurance could result in "formal enforcement proceedings," and
a third imposing "severe operating restrictions" for the protection
of its depositors as a result of the bank's "failure to appreciate the
seriousness of the agency's concerns." *Id.,* 695 F. Supp. at 479.
The court considered these letters to constitute "a demand that
the [bank's board of] directors . . . perform duties owed to the
bank," and thus a "claim" under the court's definition of the
term. *Id.,* 695 F. Supp. at 480.

Again, unlike *Mt. Hawley,* the term "claim" is defined in
Lloyd's policy. In addition, the communications from the federal
agency in *Mt. Hawley* are much more than requests for informa-
tion from the bank's files, as were the requests made of Winder-
man by the IRS and the WSC. They contain assertions of viola-
tions of federal insurance regulations and suggest violations of the
bank's "fiduciary duties" to its depositors. *Id.,* 469 F. Supp. at
479. They ask for correction of the bank's errors and omissions
and, again unlike the situation here, the FHLBB's communica-
tions threaten severe sanctions, which, given the bank's closing
by the agency, apparently came to pass. *Id.,* 695 F. Supp. at 480.

The final case put forth by Chalk is *Bensalem Tp. v. Western World Ins. Co.,* 609 F. Supp. 1343 (E.D. Pa. 1985).[4] There, the widow of a deceased town police officer brought an age discrimination case against the town based on her husband's forced retirement a few months before his death. The township sought a declaratory ruling that the suit was covered by its "claims made" policy with Western World, arguing that a letter from the Equal Employment Opportunities Commission to the township relating to an age discrimination charge filed by the widow with that agency did not constitute a "claim" under the policy. *Id.* at 1348. The letter informed the town that a complaint had been filed with the agency charging the town with "an unlawful discriminatory practice" and briefly summarized the particulars of the charge. *Id.* at 1345.

There, too, the policy contained no definition of "claim." The court, referring to two cases[5] which it stated "generally support[ed] the conclusion that . . . a 'claim' is 'a demand for something as a right,' " held that because the EEOC letter contained no such demand, there was no claim. *Bensalem Tp.,* 609 F. Supp. at 1348. Discussing the nature of a "demand" within the meaning of a claims made policy, the *Bensalem Tp.* court stated:

> Plaintiff argues, correctly in my view, that the EEOC letter . . . was at most a notice that [the officer's widow] intended to hold [the township]

---

[4]Chalk actually cites a related but different case appearing a few pages away in the reporter, *Johnson v. Township of Bensalem,* 609 F. Supp. 1340 (E.D. Pa. 1985). Having read both cases, and finding no resemblance between *Johnson* and this case, we assume the correct citation is to *Bensalem Tp.*

[5]*Phoenix Ins. Co. v. Sukut Const. Co., Inc.,* 186 Cal. Rptr. 513, 515 (Ct. App. 1982), and *Hoyt v. St. Paul Fire & Marine Ins. Co.,* 607 F.2d 864, 866 (9th Cir. 1979).

responsible for a wrongful act. Neither the letter nor the attached charge of discrimination requested money or other relief; neither document stated that a lawsuit was to follow. The closest the letter comes to any such formal demand is the statement that, upon receiving a charge of discrimination, the EEOC "is required to notify the prospective defendant and try to eliminate any alleged unlawful practice by informal conciliation, conference, and persuasion." This statement does indeed suggest that a formal lawsuit may follow (hence the term "prospective defendant"), but it also suggests that any such formal proceeding will be preceded by EEOC efforts to resolve the matter informally. The letter thus informed [the township] that a demand for relief, based on a legal right, might well follow. Neither the letter nor the charge, however, purported to be such a demand. *Id.* at 1348 [citations to record omitted].

Thus, far from lending support to Chalk's position, *Bensalem Tp.* bolsters our conclusion that no claim was made on Winderman, for neither contact by the agency investigators made any demand for money or other relief nor did they state that Winderman was going to be proceeded against for matters relating to his provision of legal services to the Wind Energy Program. The agencies' requests can in no sense be seen as demands that Winderman take affirmative action to remedy any wrong, and that, according to the *Bensalem Tp.* court, is what claims made coverage is all about:

The risk against which a "claims made" policy insures is the risk that a claim will be brought. Where, as here, the policyholder had not been asked to pay over money or to undertake affirmatively to remedy a supposed wrong, the risk that such demands might be made in the future was not yet resolved.

631

*Bensalem Tp.,* 609 F. Supp. at 1349 n. 8. The same is true here, for neither purported "demand" seeks nor suggests the need for remedial action relating to allegations of errors and omissions covered by Lloyd's policy. As a result, we do not see how they can be considered "claims" within the meaning of the coverage provisions.

Chalk disagrees. According to his reading of the Lloyd's policy language and its application to the facts of this case, any inquiry directed to the insured—whether or not it related to allegations of malpractice, or even to a particular client or other injured party—would be a "claim." Thus, in Chalk's view, whenever an attorney is requested, by anyone, to provide any information in connection with a legal matter on which the attorney has worked, a "claim" would be made encompassing all the attorney's work on that matter. We agree with Lloyd's that there must be something more than that—something more than was present in this case—in order for coverage to attach.

There must be, as the *Bensalem Tp.* court suggests, a relationship between the "demand" and the "supposed wrong"—the alleged malpractice—in order to trigger coverage. In *Phoenix Ins.,* for example, an attorney retained to prepare a mechanic's lien form for a client made several drafting errors which jeopardized the client's lien rights. Hearing of this, the client met with the attorney, pointing out the errors and requesting that they be corrected. The court held this to be a "demand" within the meaning of the attorney's claims made errors and omissions policy. *Phoenix Ins.,* 186 Cal. Rptr. at 515.

We conclude, therefore, that the "demand for money or services" that will constitute a claim under the Lloyd's policy must in some manner relate to remedying

the "wrong"—the alleged malpractice—either to correct it or compensate for it. In this case Winderman received requests from two government agencies conducting an investigation into the activities of a company he had done legal work for. The purpose of the requests was clear; the agencies were seeking general information from Winderman's files relating to the Wind Energy Program. There was no suggestion in either inquiry that Winderman's legal work for the program was either flawed or violated any law, and no request or demand was made to correct any alleged errors or shortcomings in the legal services he had provided. Nor did either request relate to any claimed injury resulting from the manner in which Winderman provided those services. Indeed, both agencies' investigations were concluded without Winderman's further involvement.

██

If, as Chalk's argument suggests, there need be no nexus between the "request" or "demand" and any claim or allegation of malpractice cognizable by the policy, the requirement that a claim be made during the policy period would become a nullity, for any request of an attorney for information about a case or client could be so characterized. No policy should be interpreted so as to render part of it useless or meaningless or to lead to an absurd result. *Stanhope v. Brown County*, 90 Wis. 2d 823, 848–49, 280 N.W.2d 711, 722 (1979); *Nichols v. American Employers Ins. Co.*, 140 Wis. 2d 743, 751, 412 N.W.2d 547, 551 (Ct. App. 1987). The trial court's interpretation of the policy was correct.

Chalk also challenges the court's ruling that Lloyd's was entitled to statutory costs against all fifty plaintiffs. Each of the several plaintiffs' claims was in excess of $1,000, and the court concluded that Lloyd's was entitled to recover $100 from each plaintiff upon the judgment of

dismissal. To that the court added $35.02, representing one-fiftieth of the total taxable disbursements.

In *DeKeyser v. Milwaukee Automobile Ins. Co.,* 236 Wis. 419, 429–30, 295 N.W. 755, 760 (1941), the supreme court held that where an electric utility was successful in gaining dismissal of a damage action against it brought by three plaintiffs, the utility was entitled to recover statutory attorney fees against each plaintiff. We see no bar to awarding the fees as against each plaintiff in this case, and Chalk does not really disagree. He argues only that the award of costs in a situation such as this is discretionary and that the trial court failed to exercise its discretion. He asks that we remand the case to allow it to do so.

Chalk's argument is based on secs. 814.03(1) and (2), Stats., which state that the defendant "shall be allowed costs" in all cases where the plaintiff is not entitled to them, and provides further that "[w]here there are several defendants who are not united in interest and who make separate defenses . . . if the plaintiff recovers against some but not all of such defendants, *the court may award costs* to any defendant who has judgment in his [or her] favor." (Emphasis added.) Emphasizing the word "may" in the final sentence, Chalk contends that because Lloyd's was only one of several defendants in the case, and that the plaintiffs did recover against some defendants, the awarding of costs to any defendant is discretionary. He points to a remark by the court at one point in the hearing on costs indicating that it didn't have any discretion under sec. 814.04(1)(a) and claims this was error. We disagree.

In context, the trial court's "no discretion" statement appears to have been directed to the amount of the costs—whether the attorney fees were mandated at $100 if the amount in controversy exceeded $1,000, or

whether the court could select a lesser sum—not whether costs could be awarded against each plaintiff.[6] We believe the court read *DeKeyser* and the applicable statutes correctly. The statutory amounts are not upper limits—such as a sentence for a term "not to exceed" a given number of years; they *are* the allowable costs in the stated actions. Moreover, the record of the hearing on costs satisfies us that, to the extent sec. 814.03(2), Stats., makes the imposition of costs against multiple plaintiffs discretionary with the court where some recover and some do not, the court properly exercised that discretion in making the award it did.

At the beginning of the hearing on Lloyd's motion for costs, the trial court indicated its concern over

---

[6]After hearing arguments of counsel and discussing the applicable law, the court ruled that, "following the precedent of *DeKeyser*," it was granting Lloyd's request for costs against each plaintiff. Chalk's attorney then said: "[J]ust so I can get this straight, is your Honor saying that he has no discretion in order to award costs here or that you have the discretion and you are awarding costs in that amount?" The court responded: "I am ruling that I don't have any discretion under (1)(a), it being that the demands were all over a thousand dollars, that I must award . . . attorney fee costs of a hundred dollars as to each plaintiff . . .."

The statute referred to by the court, sec. 814.04(1)(a), Stats., provides that "[w]hen the amount recovered or the value of the property involved is $1,000 or over, attorney fees shall be $100 . . .." Thus, the court's remarks that under (1)(a), and in light of the fact that the demands in the plaintiffs' complaint all exceeded $1,000, it had no discretion but must award $100 as to each, may fairly be interpreted as relating only to calculation of the amount, rather than the decision to award costs in the first place. As we recognize in this opinion, the record indicates that the court did exercise discretion in deciding to award costs to Lloyd's from each plaintiff.

whether costs should be assessed once for all plaintiffs, or against each plaintiff separately: "[T]he question in my mind is do I fix those as to one of the plaintiffs, as an entity, or do I fix those as to each plaintiff individually . . .." The court then discussed the *DeKeyser* case and considered the demands of each plaintiff in the case in light of the provisions of sec. 814.04(1)(b), Stats. The court then concluded, "following the precedent of *DeKeyser*," costs would be allowed against each plaintiff.

*DeKeyser* involved essentially the same statutes at issue here. At that time, sec. 271.03(1), Stats. (1939), provided that where costs are not allowable to the plaintiff, they "shall" be allowed to the defendant. The statute then continued with language nearly identical to the present sec. 814.03(2), Stats., relied on by Chalk in this case: "[W]here there are several defendants not united in interest and making separate defenses . . . and the plaintiff recovers against one or more but not all . . . the court may award costs to such of the defendants as have judgment in their favor or to any of them." In addition, sec. 271.04(1), then as now, provided that where the amount in controversy exceeded $1,000, the costs "shall be one hundred dollars."

Considering the statutes, the *DeKeyser* court reasoned simply that because the plaintiffs were not entitled to costs the utility "was therefore entitled to costs" against them and affirmed the award. *Id.,* 236 Wis. at 428, 295 N.W. at 759-60. In so holding, the court rejected a "multiple recovery" argument similar to that made by Chalk in this case and ruled that where the demands of the plaintiffs' complaints exceeded $1,000, $100 was the appropriate award against each of the plaintiffs. *Id.* at 429-30, 295 N.W. at 760.

We conclude, therefore, that the trial court properly relied on *DeKeyser* as support for its determination of costs. We are also satisfied that to the extent it is required to do so by the applicable statutes, the court exercised its discretion in arriving at its decision. It heard the arguments of counsel, discussed the statutes and case law and arrived at a decision a reasonable judge could reach. That is a proper exercise of discretion. *Hartung v. Hartung*, 102 Wis. 2d 58, 66, 306 N.W.2d 16, 20-21 (1981).

*By the Court.*—Judgment affirmed.