MARYLAND CASUALTY COMPANY, Plaintiff,

v.

Evan BEN-HUR, Defendant,

Russell J. BUDZISZ and Edward J. Wruck, d/b/a Budzisz-Wruck & Associates and Utica Mutual Insurance Company, Defendants-Third Party Plaintiffs-Appellants-Cross Respondents,†

EMPLOYERS REINSURANCE CORPORATION, Third Party Defendant-Respondent-Cross Appellant.

Court of Appeals

*No. 94–3017. Submitted on briefs July 11, 1995.—Decided July 16, 1996.*

(Also reported in 553 N.W.2d 535.)

†Petition to review denied.

412

For the defendants-third party plaintiffs-appellants-cross respondents Russell J. Budzisz and Edward J. Wruck d/b/a Budzisz-Wruck & Associates and Utica Mutual Insurance Company the cause was submitted on the briefs of *Burton A. Strnad* of *Burton A. Strnad, S.C.*, of Milwaukee.

For the third party defendant-respondent-cross appellant Employers Reinsurance Corporation the cause was submitted on the briefs of *Christine K. Nelson* of *Christine K. Nelson, S.C.*, of Brookfield.

Before Sullivan, Fine and Schudson, JJ.

SULLIVAN, J. Russell J. Budzisz and Edward J. Wruck, d/b/a Budzisz-Wruck & Associates (Budzisz-Wruck), and their errors and omissions insurer, Utica Mutual Insurance Company, appeal from a summary judgment dismissal of their third-party complaint

against Employers Reinsurance Corporation (ERC), Budzisz-Wruck's prior errors and omissions insurer. ERC cross-appeals from the judgment, which also denied ERC's motion for frivolous trial costs under § 814.025, STATS.

At issue is whether, under the terms of the ERC "claims made" policy, a claim was made during ERC's policy period. The trial court concluded that a claim was not made during ERC's policy period and granted summary judgment. We agree with the trial court. We also agree with the trial court that Budzisz-Wruck and Utica's claim was not frivolous. Accordingly, the judgment is affirmed.

## I. BACKGROUND.

The following facts are presented in the summary judgment materials. Maryland Casualty Company insured Evan and Kim Ben-Hur's home. The homeowner's policy had been applied for through Budzisz-Wruck. In the second year of the policy, on March 1, 1992, Evan Ben-Hur set fire to the home. Maryland Casualty paid a $265,324.02 settlement on that claim. Evan Ben-Hur was federally prosecuted and convicted in the arson.

Maryland Casualty sued Ben-Hur to recoup the money it paid out in the claim, and joined Budzisz-Wruck, alleging that its agent was both negligent and violated fiduciary duties owed to Maryland Casualty. Maryland Casualty alleged that Budzisz-Wruck failed to list the previous losses of the Ben-Hurs when Budzisz-Wruck submitted their application for a homeowner's policy with Maryland Casualty. Maryland Casualty also joined Utica Mutual, Budzisz-Wruck's current errors and omissions carrier.

Utica Mutual provided coverage to Budzisz-Wruck beginning September 6, 1992. ERC was Budzisz-Wruck's prior errors and omissions insurer and its "claims made" policy coverage ended at 12:01 a.m. on September 6, 1992.

The ERC policy insured against claims first made against Budzisz-Wruck during the policy period. The policy provided in relevant part:

> **COVERAGE**. The Corporation does hereby agree to pay on behalf of the Insured such loss in excess of the applicable deductible stated and within the limit of liability specified in the Declarations sustained by the Insured by reason of liability imposed by law for damages caused by:
>
> (a) any negligent act, error or omission of the Insured or any person for whose acts the Insured is legally liable, or
>
> (b) any claim for libel or slander or invasion of privacy against the Insured,
>
> arising out of the conduct of the business of the Insured in rendering services for others as a general insurance agent, insurance agent or insurance broker, and including activities as an insurance consultant or notary public and any advertising activities, as respects claims first made against the Insured during the policy period.

"Claims first made" was defined in the policy as:

> (c) the term "claims first made" shall mean that the Insured has received notice of legal process, that a demand for money or services has been made against the Insured, or that the Insured has become aware of a proceeding, event or development which has resulted in or could in the future result in the institution of a claim against the Insured. In the event of any such proceeding, event or development,

415

notice must be to the Corporation during the policy period.

The controversy in this case surrounds the "claims first made" provision of the ERC policy. On August 24, 1992, Maryland Casualty prepared a claim for the fire loss and posted it from Baltimore, Maryland, via certified mail to Budzisz-Wruck on September 2, 1992. Budzisz-Wruck received the claim on September 8, 1992, as indicated by receipt stamps on the letter and envelope. Upon receipt of the claim, Budzisz-Wruck faxed and mailed copies to Utica Mutual.

After the commencement of Maryland Casualty's action against Budzisz-Wruck, Utica Mutual admitted coverage under the errors and omissions policy it issued to Budzisz-Wruck. Utica Mutual and Budzisz-Wruck then commenced the third-party action against ERC, alleging that ERC's policy with Budzisz-Wruck was effective when Maryland Casualty made its claim. ERC answered, denying that the claim was made during the policy period.

The trial court granted summary judgment dismissal to ERC, concluding that under the terms of its policy with Budzisz-Wruck, Maryland Casualty's claim was not made during the policy period because Budzisz-Wruck had not received the claim until September 8, 1992. Budzisz-Wruck and Utica Mutual now appeal from that judgment.

## II. ANALYSIS.

The issue in this case is one of first impression in this state concerning "claims made" policies. We conclude, however, that the clear language of the ERC policy controls; thus, our analysis is quite straightforward.

416

In summary judgment cases, we employ a "methodology" identical to that applicable in the trial court. This "methodology" has been oft-repeated and we need not do so here. *E.g., Grams v. Boss*, 97 Wis. 2d 332, 338-39, 294 N.W.2d 473, 476-77 (1980). We do note, however, that our review of the trial court's ruling is *de novo*. *Bay View Packing Co. v. Taff*, 198 Wis. 2d 654, 673, 543 N.W.2d 522, 528 (Ct. App. 1995).

A. *"Claims Made" Policy*.

At issue is the construction of ERC's "claims made" policy with Budzisz-Wruck. A "claims made" policy insures for negligent acts, "including those occurring prior to the policy's effective date, as long as the claim is made during the policy period." *Chalk v. Trans Power Mfg., Inc.*, 153 Wis. 2d 621, 624 n.1, 451 N.W.2d 770, 772 n.1 (Ct. App. 1989). This differs from the more common "occurrence" policy, which "provides insurance for acts occurring during the policy period, even though the claim may not be asserted until long after the policy had expired." *Id*.

"[T]he construction of the words and clauses in an insurance policy is a question of law for the court." *Katze v. Randolph & Scott Mut. Fire Ins.*, 116 Wis. 2d 206, 212, 341 N.W.2d 689, 691 (1984). Further, we are guided by the "same rules of construction as are applied to contracts generally." *Kremers-Urban Co. v. American Employers Ins.*, 119 Wis. 2d 722, 735, 351 N.W.2d 156, 163 (1984).

> The objective in interpreting and construing a contract is to ascertain and carry out the true intention of the parties. The words of an insurance contract

417

are to be construed in accordance with the principle that the test is not what the insurer intended the words to mean but what a reasonable person in the position of the insured would have understood the words to mean. . . . Language in an insurance contract is to be given the common and ordinary meaning it would have in the mind of a lay person. Words or phrases in a contract are ambiguous when they are fairly susceptible to more than one construction. . . . Where no ambiguity exists in the terms of the policy, we will not engage in construction, but will merely apply the policy terms.

*Id.*, 119 Wis. 2d at 735-36, 351 N.W.2d at 163 (citations omitted).

Hence, the issue we address in this case is whether Maryland Casualty's claim was made within the terms of ERC's policy language. ERC argues that Budzisz-Wruck, ERC's insured under the policy, did not receive notice of Maryland Casualty's claim until September 8, 1992, after ERC's policy period terminated at 12:01 a.m. on September 6, 1992. Consequently, ERC argues that under the unambiguous terms of its policy, the claim was not made during the policy period; hence, there is no coverage under the policy. Budzisz-Wruck and Utica Mutual also argue that the relevant terms of the ERC policy are unambiguous. They argue, however, that these policy terms unambiguously provide that a demand only be made, not received. In the alternative, they argue that if the policy term is found to be ambiguous, this court should construe the policy in their favor, apply the "mail-box" rule, and conclude that Maryland Casualty's claim was made when it was posted on September 2, 1992, within the ERC policy period.

As stated above, we need only look to the terms of the ERC policy to resolve this issue. The policy only

provides coverage for "claims first made against the Insured during the policy period." The policy defines "claims first made" as meaning: (1) "that the Insured has received notice of legal process," (2) "that a demand for money or services has been made against the Insured," or (3) "that the Insured has become aware of a proceeding, event or development which resulted in or could in the future result in the institution of a claim against the Insured." The dispute in this case surrounds the second option, "that a demand for money or services has been made against the Insured." We conclude that this phrase is unambiguous and supports ERC's argument.

A common sense reading of the plain language of this phrase leads to only one reasonable conclusion—that the insured must have notice of the "demand for money or services" for the claim to be made. As another jurisdiction has concluded when construing an identical ERC policy—for the term "demand" "[t]o have a meaning, this act must have an audience." *Safeco Surplus Lines Co. v. Employer's Reinsurance Corp.*, 15 Cal. Rptr.2d 58, 60 (Cal. Ct. App. 1992).[1] Thus, for the demand to be "made," the insured must be in possession of the demand. Hence, it must be received. Under the dissent's interpretation of the clause "that a demand for money or services has been

---

[1] Although we reach our conclusion in this case solely on the plain meaning of the policy provision, we do note that the one other jurisdiction cited by the parties that has addressed this identical issue arising out of an ERC policy reached the same result that we do. *Safeco Surplus Lines Co. v. Employer's Reinsurance Corp.*, 15 Cal. Rptr.2d 58, 58-59 (Cal. Ct. App. 1992) (concluding claim is not made under ERC policy until it has been received).

made against the Insured," the insured would *never* have to know of the demand for the "claim" against it to have been "made"; a whisper into the wind or, more realistically, a letter mailed but never received would suffice. As *Safeco Surplus Lines* indicates, a "demand," to be effective, "must have an audience." *Id.*

Because we conclude the policy language is not ambiguous, we need only to apply policy terms to resolve this appeal. *Kremers-Urban Co.*, 119 Wis. 2d at 736, 351 N.W.2d at 163. The parties do not dispute that Budzisz-Wruck did not receive Maryland Casualty's claim until September 8, 1992. Further, it is undisputed that the ERC policy period ended at 12:01 a.m. on September 6, 1992. Under the plain language of the policy, Maryland Casualty's claim was not made to Budzisz-Wruck until after ERC's policy terminated; ERC no longer provided coverage to Budzisz-Wruck or had a duty to defend. The trial court properly granted summary judgment dismissal to ERC.

*B. Cross-Appeal.*

Further, ERC cross-appeals the trial court's judgment denying its motion for costs as provided by § 814.025, STATS.[2] Whether an attorney or litigant has

---

[2] Section 814.025, STATS., provides in relevant part:

(1) If an action or special proceeding commenced or continued by a plaintiff . . . is found, at any time during the proceedings or upon judgment, to be frivolous by the court, the court shall award to the successful party costs determined under s. 814.04 and reasonable attorney fees.

. . . .

(3) In order to find an action . . . to be frivolous under sub. (1), the court must find one or more of the following:

a reasonable basis in law or equity for commencing or continuing an action, is a mixed question of fact and law. *Stoll v. Adriansen,* 122 Wis. 2d 503, 513, 362 N.W.2d 182, 187 (Ct. App. 1984). Because the facts are undisputed, an issue of law is presented. The trial court determined that Utica Mutual did not know that its claim was without any reasonable basis in law or equity. Further, the issue had not been addressed by a Wisconsin appellate court. Hence, the trial court properly concluded that Budzisz-Wruck and Utica Mutual could not know the action was without a reasonable basis in law. ERC's motion was properly denied.

*By the Court.*—Judgment affirmed.

SCHUDSON, J. (*dissenting*). The appellants argue that while the policy requires that a notice of legal process be "received" to be deemed a "claim[] first made," the policy does not require that "a demand for money" be received. Thus, they contend, they prevail under the policy's unambiguous terms. The appellants are correct.

The policy provides that "the term 'claims first made' shall mean . . . that a demand for money or services has been made against the Insured." The majority, in effect, re-writes this provision stating that "[a] common sense reading of the plain language of this phrase leads to only one reasonable conclusion—that the insured *must have notice* of the 'demand for money or services' for the claim to be made." Majority op. at 419 (emphasis added).

---

(b) The party or the party's attorney knew, or should have known, that the action . . . was without any reasonable basis in law or equity and could not be supported by a good faith argument for an extension, modification or reversal of existing law.

Why? On what basis does the majority add "must have notice"—an apparent requirement that the insured *receive* the demand for money—in the absence of any policy language requiring that? The majority does not explain. On what basis does the majority add "must have notice" when, in the preceding clause of the policy, a "has received notice" requirement is included. Does the majority believe the drafters simply forgot to include this requirement in the next clause? The majority does not explain.

The appellants also argue that *if* the policy is ambiguous, it should be construed to support their position. The appellants cite substantial Wisconsin authorities applying the "mail-box" rule to a variety of cases with at least some similarities to the circumstances and policy concerns of this case. As the appellants explain, a date of mailing often is more definitive and less subject to misrepresentation than a date of receipt. Moreover, as the appellants contend, if this policy is ambiguous, it should be construed against ERC, the drafter.

I conclude that the appellants have presented prevailing arguments under both their "unambiguous policy" and "ambiguous policy" theories. The majority has reached its conclusion by re-writing the policy and inexplicably adding dispositive terms. Accordingly, I respectfully dissent.